[No. S051274. Jan. 2, 1997.]

CALIFORNIA TEACHERS ASSOCIATION et al., Plaintiffs and Appellants, v.
GOVERNING BOARD OF RIALTO UNIFIED SCHOOL DISTRICT et al., Defendants and Respondents.

628

## COUNSEL

Charles R. Gustafson, Beverly Tucker, Rosalind D. Wolf and Robert E. Lindquist for Plaintiffs and Appellants.

Atkinson, Andelson, Loya, Ruud & Romo, Sherry G. Gordon, Howard J. Fulfrost and Byron C. Smith for Defendants and Respondents.

John L. Bukey, Abhas Hajela, Lozano, Smith, Smith, Woliver & Behrens, Michael E. Smith and John C. Valdez as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**WERDEGAR, J.**—We address in this case the proper interpretation of Education Code section 44919, subdivision (b) (hereafter section 44919(b); all statutory references are to the Education Code unless otherwise stated), which concerns the employment of persons to serve in "limited assignment[s] supervising athletic activities of pupils," i.e., athletic coaches. Specifically, we must construe the portion of the statute providing that such positions, when vacant, "shall first be made available to teachers presently employed by the district." We hold the language of section 44919(b) demonstrates the Legislature intended to accord an advantage in the hiring process, as discussed hereafter, to credentialed teachers presently employed by the school district, provided such teachers apply for the position and are otherwise qualified under applicable criteria promulgated by the school district.

## FACTS

The facts are essentially undisputed:[1] Defendant Rialto Unified School District (hereafter the District) had one high school, Eisenhower High School, and decided to open a second one, Rialto High School, in September 1992. Staffing decisions for the new school began in the spring of 1992. Flyers were circulated advertising an opening for a boys varsity basketball coach at the new high school. Gary Stanley, a tenured, credentialed teacher employed in a district junior high school, applied for the job. He also applied for a subsequent opening for an assistant coach for the boys varsity team. Finally, he applied for an opening to serve as assistant coach on the boys freshman basketball team.

The District filled the boys head coach position by hiring Martin Sipe, who had been head coach for the boys varsity basketball team at Eisenhower High School. Sipe, a credentialed teacher, was also selected to serve as Rialto High School Athletic Director. The District then hired Keith Ellis, who had been Sipe's assistant coach at Eisenhower, to fill the assistant varsity coach position at Rialto. Ellis was a security guard for the District and was therefore a classified (i.e., noncredentialed) employee. Stanley was not interviewed for either position.

Sipe, apparently in his role as athletic director for Rialto High, interviewed three applicants for the position of assistant coach for the freshman team: Stanley, an unidentified teacher, and Dion Downey. Sipe recommended to Rialto High School Principal Anna Rodriguez that the District hire Downey, as Sipe believed he was the most qualified of the three applicants. Rodriguez concurred in the recommendation and referred it to the District's governing board. The District hired Downey to fill the remaining assistant coach position. Downey does not have a teaching credential.

Plaintiff Stanley, joined by two nonprofit employee organizations, the California Teachers Association and the Rialto Education Association (hereafter collectively Stanley), filed a petition for a writ of mandate in superior court, seeking: (i) to require the District to comply with section 44919(b) and (ii) damages. The trial court denied the writ, finding section 44919(b) does not require the District, when hiring to fill an open athletic coaching position, to give credentialed teachers currently employed in the district a hiring preference over noncredentialed employees or nonemployees. The Court of Appeal reversed, and we granted the District's petition for review.

---

[1]No evidence was taken below, with both sides submitting on the state of the record, which included admissions by the District, as well as declarations under penalty of perjury by Martin Sipe, Anna Rodriguez, and Gary Stanley.

## DISCUSSION

Resolution of this case turns on the proper interpretation of section 44919(b), which provides: "Governing boards shall classify as temporary employees persons, other than substitute employees, who are employed to serve in a limited assignment supervising athletic activities of pupils; *provided, such assignment shall first be made available to teachers presently employed by the district.* Service pursuant to this subdivision shall not be included in computing the service required as a prerequisite to attainment of, or eligibility to, classification as a permanent employee of a school district." (Italics added.)

The District contends the phrase in section 44919(b) emphasized above requires only that it advertise openings for athletic coach positions to teachers currently employed in the district and allow them to apply for such positions, but the statute does not give such teachers any other advantage in the employment process. By contrast, Stanley argues (and the Court of Appeal held) section 44919(b) grants such teachers a "right of first refusal" for vacant athletic coach positions.

As in many past cases, we are called upon to interpret a legislative enactment whose meaning is not as clear as the parties, and the appellate courts, would like. As we explain below, section 44919(b) cannot mean (as argued by the District) that school districts can comply with the statute simply by posting notice of an athletic coach opening so that teachers can learn of the vacancy. On the other hand, we also reject Stanley's rigid interpretation of section 44919(b), which would elevate teachers to a level above that which we believe our Legislature envisioned when it amended section 44919(b) to its present wording.

We begin with the touchstone of statutory interpretation, namely, the probable intent of the Legislature. To interpret statutory language, we must "ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386 [241 Cal.Rptr. 67, 743 P.2d 1323].) In undertaking this determination, we are mindful of this court's limited role in the process of interpreting enactments from the political branches of our state government. In interpreting statutes, we follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law, " ' "whatever may be thought of the wisdom, expediency, or policy of the act." ' " (*People* v. *Weidert* (1985) 39 Cal.3d 836, 843 [218 Cal.Rptr. 57, 705 P.2d 380], quoting *Woodmansee* v. *Lowery* (1959) 167 Cal.App.2d 645, 652 [334 P.2d 991].)

"[A]s this court has often recognized, the judicial role in a democratic society is fundamentally to interpret laws, not to write them. The latter power belongs primarily to the people and the political branches of government . . . ." (*Kopp* v. *Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 675 [47 Cal.Rptr.2d 108, 905 P.2d 1248] (conc. opn. of Werdegar, J.).) It cannot be too often repeated that due respect for the political branches of our government requires us to interpret the laws in accordance with the expressed intention of the Legislature. "This court has no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed." (*Seaboard Acceptance Corp.* v. *Shay* (1931) 214 Cal. 361, 365 [5 P.2d 882]; *People* v. *One 1940 Ford V-8 Coupe* (1950) 36 Cal.2d 471, 475 [224 P.2d 677]; *County of Madera* v. *Superior Court* (1974) 39 Cal.App.3d 665, 668 [114 Cal.Rptr. 283]; *Woodmansee* v. *Lowery, supra,* 167 Cal.App.2d 645, 652.)

"Our first step [in determining the Legislature's intent] is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning. (*Mercer* v. *Department of Motor Vehicles* (1991) 53 Cal.3d 753, 763 [280 Cal.Rptr. 745, 809 P.2d 404]; *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)" (*People* v. *Valladoli* (1996) 13 Cal.4th 590, 597 [54 Cal.Rptr.2d 695, 918 P.2d 999].) In our case, the actual words comprise a single, critical phrase: "provided, such assignment shall first be made available to teachers presently employed by the district." (§ 44919(b).)

The District contends this language, especially the phrase "made available," merely directs it to "make the application and interview process available to current certificated employees." This proposed interpretation is flawed for several reasons. First, the actual words of section 44919(b) do not mention or even allude to *the application and interview process.* The statute does not direct school districts to make *the application process* available to teachers. Had the Legislature intended school districts merely to provide teachers with an opportunity to apply for a vacant coaching position, it could easily have written the statute to state: "provided, teachers presently employed by the district shall be notified of such a job opening." Instead, section 44919(b) plainly provides school districts must make *the assignment itself* available to such teachers. The "assignment," of course, is the actual position of athletic coach. The District's proposed interpretation is thus inconsistent with the very terms of the statute.

The District's proposed interpretation is implausible for a second reason. Were we to conclude, as the District urges, that section 44919(b) merely

requires it to consider applications from teachers employed in the school district, but that such teachers enjoy no further advantage in the employment process, section 44919(b) would be a nullity, for it would then give teachers no greater rights than they would have in the absence of the statute. In other words, even without a statute, nothing would prevent such teachers from learning of an opening for athletic coach and applying to fill the opening. We cannot presume the Legislature, in amending section 44919 in 1977 to add subdivision (b) (see Stats. 1977, ch. 565, § 1, pp. 1795-1796), engaged in an idle act or enacted a superfluous statutory provision. (*Shoemaker* v. *Myers* (1990) 52 Cal.3d 1, 22 [276 Cal.Rptr. 303, 801 P.2d 1054, 20 A.L.R.5th 1016].)

A third reason the District's proposed interpretation of section 44919(b) is flawed strikes to the heart of the matter: The District's proposed interpretation fails to give meaning to every word in the key phrase. ▆ "In analyzing statutory language, we seek to give meaning to every word and phrase in the statute to accomplish a result consistent with the legislative purpose . . . ." (*Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1159 [278 Cal.Rptr. 614, 805 P.2d 873]; *Heller* v. *Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 39 [32 Cal.Rptr.2d 200, 876 P.2d 999].)

▆ Section 44919(b) states: "such assignment shall *first* be made available to teachers presently employed by the district." (Italics added.) By using the word "first," the Legislature clearly intended to afford some degree of advantage or priority to "teachers presently employed by the district," placing them on a level *above* both noncredentialed employees currently employed by the district, as well as persons not then employed by the district in question, whether or not credentialed.[2] Under the District's proposed interpretation of section 44919(b), however, teachers can simply apply and be considered along with every other applicant, with no advantage. We fail to see how this interpretation of section 44919(b) assigns any substantive meaning to the word "first."

The dissent posits a possible meaning of the word "first" that assertedly gives teachers some advantage in the hiring process. The dissent claims the word "first" simply means teachers must be notified of a coaching vacancy before a nonteacher candidate is hired. (Dis. opn., *post*, at p. 656.) With due respect, this interpretation is empty of content. If teachers must be notified of job openings before a walk-on candidate is hired, but then must apply and be considered for the position with all candidates (i.e., in a pool containing

---

[2]Persons not presently employed by a district who are hired are known as "walk-ons." (See *San Jose Teachers Assn.* v. *Barozzi* (1991) 230 Cal.App.3d 1376, 1378 [281 Cal.Rptr. 724].)

both teachers and walk-ons), the early notification would provide no particular advantage at all, and no reason appears why the Legislature would see fit to amend the statute to include this provision. Indeed, giving teachers notice of a vacancy at the same time as nonteacher applicants would seem to serve equally well.

Contrary to the protestations of the dissent, such early notification of teachers would not prevent a school district that secretly preferred a walk-on candidate from simply complying with the early notice requirement and thereafter hiring the outsider of its choice. Moreover, in the situation where a school district did not have a candidate already in mind, but simply wanted to cast a wide net to find a candidate whom it considered the best coach available, whether a teacher or walk-on, early notification to teachers (with no other hiring advantage) would offer no special benefit at all. To reiterate, we cannot assume our Legislature engaged in an idle act or enacted a superfluous statutory provision. (*Shoemaker* v. *Myers, supra,* 52 Cal.3d at p. 22.)[3]

 Because the District's proposed interpretation of section 44919(b) (i.e., that only the *application process* be made available to credentialed teachers in the district) fails to give meaning to every word of the statute, we reject it as unreasonable. Instead, the key phrase ("such assignment shall first be made available to teachers presently employed by the district") must mean the Legislature intended such teachers to enjoy some type or degree of priority in filling vacant coaching positions. Stated differently, we find the Legislature intended teachers employed in the school district to have some tangible advantage in the hiring process not shared by walk-on candidates. Early *notification* of a job vacancy, without more, does not constitute such an advantage.

Having rejected the District's proposed interpretation, we now also reject Stanley's proposed interpretation. Stanley contends that, as the only applicant for the assistant athletic coach positions at issue who was a credentialed teacher presently employed in the school district,[4] he was entitled to the job *on demand.* That is, he claims the district was required to give him the opportunity to accept or decline the coaching position before offering it to a

---

[3]Needless to say, we also reject the interpretation embraced by both the District and the dissent that districts can satisfy the key phrase of section 44919(b) by merely posting notice of the vacancy. Of course, nothing in the actual words of the statute in question mentions the "posting" of notices, and, as the statutes cited by the dissent make clear, the Legislature knows how to specifically require the posting of notices. (Dis. opn., *post,* at p. 655.)

[4]The abbreviated record indicates an unidentified teacher also applied unsuccessfully for the position of assistant to the boys freshman basketball team. Because the District filled the

noncertificated employee or a nonemployee. We disagree. Stanley's interpretation of section 44919(b) is too rigid, for it fails to take into account the relevant qualifications and skills the school district may require of an applicant before entrusting him or her to "supervis[e] athletic activities of pupils." One cannot qualify for a coaching position simply by possessing a teaching credential. In short, that an applicant for a coaching position is a "teacher[] presently employed by the district," is not, by itself, a guarantee of the job.

Having rejected the interpretations of section 44919(b) proposed by both the District and Stanley, we turn to the more difficult question, namely, what type of employment advantage does section 44919(b) confer on "teachers presently employed in the district"? To answer this question, we begin with a public policy decision the Legislature has made, as expressed in other, related statutes: power over matters involving interscholastic athletics resides in the governing boards of the individual school districts.

Some history helps explain the Legislature's policy decision in this regard. The key phrase now under scrutiny in section 44919(b) was added to that statute in 1977. (Stats. 1977, ch. 565, § 1, pp. 1795-1796.) At that time, and until 1981, the Legislature placed primary control over athletic activities in public schools in the State Department of Education. Section 33352, as it read before 1981, stated: "The Department of Education shall exercise general supervision over the courses of physical education in elementary and secondary schools of the state; *exercise general control over all athletic activities of the public schools*; advise school officials, school boards, and teachers in matters of physical education; and investigate the work in physical education in the public schools." (Stats. 1976, ch. 1010, § 2, p. 3043, operative Apr. 30, 1977, italics added.)

Beginning in 1981, the Legislature began transferring general supervisory power over public school athletic activities from the Department of Education to the individual school districts. First, section 33352 was amended to delete the phrase directing the department to "exercise general control over all athletic activities of the public schools." (Stats. 1981, ch. 1001, § 1, p. 3866.) More importantly, the same legislation added section 35179, which provided: "(a) Each school district governing board shall have general control of, and be responsible for, all aspects of the interscholastic athletic policies, programs, and activities in its district, including, but not limited to, eligibility, season of sport, number of sports, *personnel*, and sports facilities." (Stats. 1981, ch. 1001, § 5, p. 3868, italics added.) As is clear, these

position with a walk-on candidate, the fact another teacher applied is irrelevant for purposes of the present argument.

1981 enactments "retained the education department's power of general supervision over physical education courses, . . . [but] divested the department of control over interscholastic athletics, vesting that control instead in the governing boards of school districts." (*San Jose Teachers Assn.* v. *Barozzi, supra,* 230 Cal.App.3d at p. 1381; see also *Steffes* v. *California Interscholastic Federation* (1986) 176 Cal.App.3d 739, 750 [222 Cal.Rptr. 355].)

Although the Legislature changed this system slightly when it enacted former section 35179.5 in 1985 (Stats. 1985, ch. 694, § 1, p. 2306), it nevertheless preserved each school district's control over athletics. Former section 35179.5 stated in pertinent part: "(a) The State Board of Education shall adopt rules and regulations establishing minimum qualifications for persons who are employed by school districts under subdivision (b) of Section 44919 to serve in a limited assignment supervising the athletic activities of pupils. The adopted rules and regulations shall include, but need not be limited to, minimum educational and work experience standards which will ensure that these employees are qualified to provide supervision and instruction of pupils participating in interscholastic athletic programs and activities." Subdivision (b) of former section 35179.5 further provided: "The governing board of each school district shall comply with the rules and regulations establishing minimum qualifications for persons employed in a limited assignment supervising the athletic activities of pupils adopted by the State Board of Education under Subdivision (a)."

Pursuant to this new enabling authority, the State Board of Education promulgated statewide regulations establishing minimum qualifications for athletic coaches, codified as title 5, section 5593 of the California Code of Regulations (hereafter Regulation 5593).[5] It was this regulation that was in effect when Stanley brought his suit. The regulation, by its terms, expressly

---

[5]Title 5, section 5593, of the California Code of Regulations provided: "This section applies to any person serving at any grade level as a temporary athletic team coach.

"(a) The district shall determine whether a temporary athletic team coach is knowledgeable and competent in the areas of:

"(1) Care and prevention of athletic injuries, basic first aid and emergency procedures;

"(2) Coaching techniques;

"(3) Rules and regulations in the athletic activity being coached; and

"(4) Child or adolescent psychology, whichever is appropriate to the grade level of the involved sports activity.

"(b) The district shall establish a temporary athletic team coach's qualifications in each of the below specified four competency areas.

"(1) Care and prevention of athletic injuries, basic sports injury first aid, and emergency procedures as evidenced by one or more of the following:

"(A) Completion of a college-level course in the care and prevention of athletic injuries and possession of a valid cardiopulmonary resuscitation (CPR) card; or

recognized that school districts retained significant local control, notwithstanding applicable statewide regulations. For example, subdivision (a) of Regulation 5593 provided: "*The district* shall determine whether a temporary athletic coach is knowledgeable and competent in [four specified areas]." (Italics added.) In addition, subdivision (b) of the regulation provided: "*The district* shall establish a temporary athletic coach's qualifications in each of the below specified four competency areas." (Italics added.)

Thus, despite establishment of statewide minimum qualifications standards for coaches pursuant to Regulation 5593, each school district retained discretion in two significant areas. First, each district could still evaluate a coaching applicant's knowledge and competency in four relevant subject areas: first aid, coaching techniques, rules of the sport, and child or adolescent psychology. By permitting individual school districts to retain the evaluative function when choosing their athletic coaches, Regulation 5593

---

"(B) A valid sports injury certificate or first aid card, and a valid cardiopulmonary resuscitation CPR card; or

"(C) A valid Emergency Medical Technician (EMT) I or II card; or

"(D) A valid trainer's certification issued by the National or California Athletic Trainers' Association (NATA/CATA); or

"(E) The person has had practical experience under the supervision of an athletic coach or trainer, or has assisted in team athletic training and conditioning, and has both valid CPR and first aid cards.

"(2) Coaching theory and techniques in the sport or game being coached, as evidenced by one or more of the following:

"(A) Completion of a college course in coaching theory and techniques; or

"(B) Completion of in-service programs arranged by a school district or a county office of education; or

"(C) Prior service as a student coach or assistant athletic coach in the sport or game being coached; or

"(D) Prior coaching in community youth athletic programs in the sport to be coached; or

"(E) Prior participation in organized competitive athletics at high school level or above in the sport to be coached.

"(3) Knowledge of the rules and regulations pertaining to the sport or game being coached, the league rules and, at the high school level, regulations of the CIF.

"(4) Knowledge of child or adolescent psychology as it relates to sports participation as evidenced by one or more of the following:

"(A) Completion of a college-level course in child psychology for elementary school positions and adolescent or sports psychology for secondary school positions; or

"(B) Completion of a seminar or workshop on human growth and development of youth; or

"(C) Prior active involvement with youth in a school or community sports program.

"(c) The school district superintendent may waive compliance with any one or more of the competencies described in subsection (a) provided that the person is enrolled in a program leading to acquisition of a competency. Until the competencies are met, the prospective coach shall serve under the immediate supervision of a fully qualified temporary athletic team coach."

preserved to the districts the local control they had enjoyed before promulgation of the regulation.

Second, Regulation 5593 expressly permitted districts to continue to set qualification criteria for athletic coaches in accordance with local priorities. In other words, each school district retained the discretion to promulgate and apply *heightened qualifications standards* for a particular coaching position so as to ensure that level of competence, knowledge, skill, and experience the district preferred. This much is clear from the fact Regulation 5593 established *minimum* qualification criteria, but did not purport to establish *maximum* qualification standards.

Former section 35179.5 was amended in 1990, but the Legislature did not alter its basic framework. (Stats. 1990, ch. 1212, § 1, pp. 5077-5078.)[6] The express terms of former section 35179.5, as amended, included a sunset provision providing the statute would be repealed as of January 1, 1994, unless extended by the Legislature. No action was taken and former section 35179.5 was allowed to lapse as of its final date. Its demise meant the enabling legislation for Regulation 5593 also disappeared. The repeal of section 35179.5 did not, however, serve to remove from local school districts power over the selection of athletic coaches. Control over the hiring of athletic coaches, placed initially with the individual school districts by section 35179 and later continued by the provisions of Regulation 5593, was retained, because section 35179—with its express grant to school districts of power over athletic "personnel"—remained in effect throughout this period.

In sum, individual school districts have, since January 1, 1982 (i.e., the effective date of section 35179; see Stats. 1981, ch. 1001, § 5, p. 3868), enjoyed the benefits of the Legislature's educational policy choice—as expressed through statutory enactments, amendments and deletions—delegating to individual districts discretion over the hiring of athletic coaches.

This delegation of discretion takes two forms. First, districts may establish the qualifications for athletic coaches as high as necessary to coincide with local preferences (with the caveat that during the period Regulation 5593 was in effect, local qualifications could not fall below the specified minimums). Under this system, each school district may decide for itself how

---

[6]The first part of the amendment added language to subdivision (a), directing athletic coaches be qualified "in the subject of substance abuse prevention, including, but not limited to, tobacco, alcohol, steroids, and human growth hormones." (Stats. 1990, ch. 1212, § 1, p. 5077.) This amendment is irrelevant to our present discussion. The second part of the amendment added a new subdivision (d), clarifying that, "[t]his section shall apply to all credentialed persons and staff providing instruction in or supervision of athletic activities." (Stats. 1990, ch. 1212, § 1, pp. 5077-5078.)

experienced a coach it wants and how dynamic a coach it needs. Each district may decide how to allocate scarce educational resources to athletics, which sports deserve funding, and how much. For example, each district may decide for itself whether "success" should be measured by winning on the field or by the creation of an athletic environment that does not overemphasize winning. A district might define "excellence" as the attainment of a high graduation rate among student athletes or the realization of moderate success on the field coupled with an emphasis on students' academic studies. A district might decide the goal for its coaches is an increase in the participation of girls in competitive sports or the increased participation in sports by all students. All of these goals are worthy; the point is the Legislature has left it to the individual school districts to rank these (and no doubt other) values in relative importance according to local conditions and preferences. That members of the governing boards of school districts are elected further ensures each district's conception of what makes a "successful" athletic coach will be followed.

Under this scheme of individual school district discretion, if a district were to decide it desired for a particular sport a coach more experienced or successful than one who met only minimum qualifications, the district could set elevated qualification standards so as to ensure applicants would possess a proportionately higher degree of demonstrated knowledge, competence, experience, past success or skill.

Second, the discretion granted districts permits them to assess the knowledge, competence, skill and experience of any coaching applicants in accordance with the qualifications so established. Thus, whatever qualifications a district establishes, it retains much leeway in determining whether an applicant for a coaching position has met those criteria. For example, whether a coaching candidate is "competent in the area[] of: [¶] . . . [¶] Child or adolescent psychology, whichever is appropriate to the grade level of the involved sports activity" (see former Reg. 5593, subd. (a)(4)), can rightly involve an assessment of whether the candidate can demonstrate an ability to motivate student-athletes or to help students balance a demanding academic workload with an athletic commitment. Whether a coaching candidate is "knowledgeable and competent in the area[] of: [¶] . . . [¶] Coaching techniques" (see former Reg. 5593, subd. (a)(2)), can properly involve more than a candidate's knowledge of drills and exercises, permitting an evaluation of whether he or she has demonstrated an ability to instill commitment, discipline, and teamwork in a group of young people of perhaps widely varying athletic ability, socioeconomic background, or language skills.

Although some of these assessments, by their nature, involve the evaluation of intangibles, we believe allowing districts to consider such

intangibles is consistent with the Legislature's clear policy decision to commit to individual school districts the power both to establish the qualifications for athletic coaches and to determine the competency and knowledge of individual applicants for coaching positions. In recognizing the school districts' power in this regard, we do no more than follow the Legislature's declaration of educational policy, as expressed in the various statutory enactments, amendments and deletions described above.

As indicated, Stanley's case arose during the period in which Regulation 5593 was in effect. Whether the District adopted as its local rules the standards set forth in Regulation 5593, or established for the basketball coach positions at issue in this case some higher qualification standards, is unclear from the record. As demanding or stringent as the District's qualifications for basketball coach may have been, however, Stanley—as a teacher currently employed in the district—was entitled, pursuant to section 44919(b), to have the District consider his application before the applications of walk-on candidates and to hire him, if qualified under the established standards.

The District raises a variety of contrary arguments, but, after close scrutiny, we find none persuasive. Thus, the District argues that when the Legislature, in other parts of the Education Code, has established a preferential right to employment, it has used verbal formulations that make clear it was giving teachers such a right. For example, section 44918, subdivision (c), provides that if a district employs a temporary or substitute employee "for two consecutive years and that employee has served for at least 75 percent of the number of days the regular schools of the district were maintained in each school year and has performed the duties normally required of a certificated employee of the school district, *that employee shall receive first priority if the district fills a vacant position* . . . ." (Italics added.)

Similarly, section 45195 provides a classified employee who has exhausted his or her paid leave due to a nonindustrial accident or illness may be granted an additional six-month unpaid leave. Following this period, if the employee is still unable to resume his or duties, the employee is placed on a 39-month reemployment list. Section 45195 continues: "At any time, during the prescribed 39 months, the employee is able to assume the duties of his or her position *the employee shall be reemployed in the first vacancy* in the classification of his or her previous assignment." (Italics added.) Further, "[t]he employee's reemployment *will take preference* over all other applicants," with some other exceptions. (*Ibid.*, italics added; see also §§ 44830,

subd. (m) ["[a] school district may hire a teacher credentialed in another state who has not taken the state basic skills test if," among other reasons, the district certifies its "need to fill the position and the reasons for the need, proof of its attempts to recruit qualified teachers in California, and a statement attesting to the failure of those attempts"], 44917 [district must hire substitute teachers from "regularly employed persons absent from service," but after September 1st, may hire others on conditions including that there is "no regular employee . . . available"], 44918, subd. (b) [temporary or substitute employee who worked at least 75 percent of the time the previous year "shall be reemployed for the following school year to fill any vacant position[]" unless other enumerated conditions apply], 44956, subd. (a)(1) [in some circumstances, terminated permanent employee who has not yet attained the age of 65 "shall have the preferred right to reappointment . . . if the number of employees is increased or the discontinued service is reestablished"], 45119 [in situation concerning reorganization of a school district, if there are more teachers than jobs in the reorganized district, "such personnel shall . . . be placed upon appropriate reemployment lists for 39 months and, if so placed, shall be offered and may accept positions of lower rank in their line of promotion in the order of seniority"].)

 Of course, we interpret a statute in context, examining other legislation on the same subject, to determine the Legislature's probable intent. (*Harry Carian Sales* v. *Agricultural Labor Relations Bd.* (1985) 39 Cal.3d 209, 223 [216 Cal.Rptr. 688, 703 P.2d 27]; *Cossack* v. *City of Los Angeles* (1974) 11 Cal.3d 726, 733 [114 Cal.Rptr. 460, 523 P.2d 260].) The District contends that because the Legislature, in the above cited instances, carefully and clearly expressed its intent that certain persons should have a preferential right of reemployment, we should conclude the Legislature's failure to use unambiguous language in section 44919(b) must mean it intended no such priority right.[7]

 We agree with the District the six statutes cited above give the described classes of persons a preferential right of reemployment. We disagree, however, that because the Legislature's choice of words in section 44919(b) is not as clear as in the six cited statutes, nor does it duplicate any of their various language, we should infer the Legislature did not intend in section 44919(b) to create a preferential employment right. Although the District argues the Legislature has used "very precise language" when

---

[7]This argument was raised in the Court of Appeal for the first time in the District's petition for rehearing. The issue is properly before this court, however, because the facts are undisputed and the issue merely raises a new question of law. (*Hittle* v. *Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374, 391, fn. 10 [216 Cal.Rptr. 733, 703 P.2d 73].) Stanley does not contend otherwise.

creating a preferential employment right in other situations, even cursory inspection of the six examples set forth above reveals that the Legislature has used a different phraseology in each instance. ██ Although a "word or phrase, or its derivatives, accorded a particular meaning in one part or portion of a law, should be accorded the same meaning in other parts or portions of the law" (*Miranda* v. *National Emergency Services, Inc.* (1995) 35 Cal.App.4th 894, 905 [41 Cal.Rptr.2d 593]), the Legislature has not used consistent language here. ██ In short, there is no "term of art" that is missing in section 44919(b), because there is no evidence the Legislature uses a "term of art" when describing a preferential employment right. Accordingly, because the Legislature has not consistently used any particular wording in the Education Code to create a preferential employment right, we find no significance in the fact its choice of words in section 44919(b) fails to duplicate language in any of the other statutes that create such a right.

The District, supported by amici curiae,[8] next makes a constellation of related arguments to the effect that our interpretation of section 44919(b) will lead to the absurd result of forcing districts to employ *unqualified* athletic coaches, merely because an applicant is a credentialed teacher currently employed in the district, and without consideration of the teacher-applicant's relevant qualifications. (See *California School Employees Assn.* v. *Governing Board* (1994) 8 Cal.4th 333, 340 [33 Cal.Rptr.2d 109, 878 P.2d 1321] [court "need not follow plain meaning of a statute when to do so would . . . '[lead] to absurd results.' "].) Together, the District and amici curiae pose a parade of horribles emanating from this perceived "rule." The District and amici curiae argue such a rule would, for example, mandate that a district rehire as a coach a teacher who had previously been dismissed from a coaching position for unfitness or misconduct, if that teacher were the only credentialed applicant the next year. The District and amici curiae contend such an interpretation of section 44919(b) will lead to the employment of incompetent, dangerous or unfit teachers as athletic coaches and expose districts to liability for negligent hiring, that such prospects will lead districts to hire only those teachers who can also coach athletics, or that in hiring teachers districts will give preference to applicants who it is reasonably sure will not apply for a coaching position, with little regard for their teaching abilities. The District posits its ultimate worst case scenario: suppose a district needs a new varsity football coach at the high school and the only credentialed teacher currently employed in the district who applies is "a

---

[8]We have received amicus curiae briefs in support of the District from the Templeton Unified School District and the Education Legal Alliance. The latter entity describes itself as "a non-profit association of public school district (K-12) governing boards and county boards of education . . . [whose members represent] more than 650 of the state's 1,000 school districts."

kindergarten teacher with no knowledge of skills at the sport [and yet] the district would be compelled to offer that person the position[!]"

We find these claims to be exaggerated and unrealistic for the simple reason that the District's premise, namely, that our interpretation of section 44919(b) will require it to hire unqualified athletic coaches, is patently incorrect. We reiterate that districts have the discretion both to establish their own coaching qualifications and to evaluate coaching applicants to determine whether they meet those standards. Because no district is forced to hire an "unqualified" coach, as the districts may define that term, the District's argument falls of its own weight.

In short, the District and amici curiae fail to appreciate that section 44919(b) gives credentialed teachers currently employed in the district an employment *preference*, not a *guarantee* of the position they seek. Only to the extent a teacher-applicant currently employed in the school district, including a kindergarten teacher, satisfies the qualifications promulgated by the district, does section 44919(b) prohibit the district from hiring a walk-on in preference to the teacher. If more than one teacher in the district applies and meets the district's qualifications, the district may employ its evaluative function to hire whomever of the teacher-applicants it considers the best qualified. In no sense, therefore, does a teacher's mere status as a credentialed employee currently working in the district guarantee the teacher employment as an athletic coach, should he or she apply.

Our interpretation of section 44919(b) necessarily undermines several of the District's other, subsidiary, arguments. First, the District contends the phrase "make available" means "gain through effort." Because we hold that a teacher who applies for an athletic coach position is not guaranteed the position, but must demonstrate his or her qualifications under applicable regulations as promulgated by the district, as well as superiority over other teacher-applicants, our interpretation of the statute is consistent with the District's argument that teacher-applicants must gain assignments as athletic coaches through "effort."

Second, the District contends requiring it to hire teacher-applicants as athletic coaches merely because teachers apply, are credentialed and are currently employed in the district, would require it to violate article I, section 28, subdivision (c) of the California Constitution, the so-called "Right to Safe Schools" enacted as part of Proposition 8 in 1982. That provision states: "All students and staff of public primary, elementary, junior high and senior high schools have the inalienable right to attend campuses

which are safe, secure and peaceful." The District argues using unqualified coaches will lead to more sports injuries and, therefore, an unsafe school environment in violation of the constitutional guarantee.

This argument is specious for two reasons. First, it proceeds from the assumed premise the District will be forced to hire unqualified coaches. As we have explained, *ante*, that premise is patently erroneous. Second, the District's reliance on article I, section 28, subdivision (c) of the state Constitution is misplaced in this context. That constitutional provision was part of a larger package of reforms intended to strengthen substantive and procedural safeguards in the criminal justice arena. To the extent the District argues the "Right to Safe Schools" constitutional provision is relevant to a proper interpretation of section 44919(b), which has no relevance to criminal law or procedure, it is mistaken. (See *Clausing* v. *San Francisco Unified School Dist.* (1990) 221 Cal.App.3d 1224, 1236 [271 Cal.Rptr. 72] [Article I, section 28, subdivision (c) is not self-executing and does not create a private cause of action for damages.]; see also *Brosnahan* v. *Brown* (1982) 32 Cal.3d 236, 247-248 [186 Cal.Rptr. 30, 651 P.2d 274] [Proposition 8 satisfies single subject rule in that article I, section 28, subdivision (c) is interpreted as limited to the criminal law arena].)

The District next argues the language of section 44919(b) is unclear and thus urges we examine the section's history. Even were we, for purposes of argument, to agree the language of section 44919(b) lacks sufficient clarity, our examination of the legislative history of the section reveals little support for the District's proposed interpretation.

Before its amendment, section 44919 provided in pertinent part that if a temporary certificated employee worked longer than "the first three school months of any school term . . . , the certificated employee, unless a permanent employee, shall be classified as a probationary employee." This identical provision remains in current subdivision (a) of the section. Its significance lies in the fact that probationary employees have somewhat greater statutory protections than are enjoyed by mere temporary employees. (Compare § 44954 [release of temporary employees] with § 44957 [preferred right of terminated probationary employee to reemployment under certain circumstances]; see also § 44958 [termination of probationary employee's reemployment rights due to reduction in attendance of pupils].)

In 1977, section 44919 was amended to add subdivision (b). (Stats. 1977, ch. 565, § 1, pp. 1795-1796.) The amendment, proposed by Assemblymember Dixon on April 14, 1977, as Assembly Bill No. 1690, 1977-1978 Regular

Session (Assembly Bill No. 1690), made only two changes to the existing statute: (i) it added language that became subdivision (b) to provide that school district governing boards could classify as temporary employees those persons employed as athletic coaches, and (ii) it numbered as subdivisions (a) and (c) the two pre-amendment paragraphs of the statute. The Legislative Counsel's Digest stated: "The law currently specifies the circumstances under which a school district may employ a certificated individual and classify such person as a 'temporary' employee. In general, such classification is limited to employment for terms of not longer than 3 or 4 months, depending on the type of assignment. [¶] This bill would add to the circumstances under which a certificated individual could be classified as a 'temporary' employee, cases in which a person was employed to serve in a limited assignment supervising the extracurricular activities of pupils. The bill would not limit such classification to employment for terms of any specified length." (Legis. Counsel's Dig., Assem. Bill No. 1690 (1977-1978 Reg. Sess.) Apr. 14, 1977.)

Assembly Bill No. 1690 was amended in the Assembly on June 1, 1977. Significantly, the amendment added two provisions to the proposed subdivision (b) of section 44919: (i) the language now under examination regarding the employment preference for teachers in the district, and (ii) a final sentence providing that time of service as an athletic coach shall not be included when calculating time required as a prerequisite for attainment of permanent employee status. The Legislative Counsel, however, made only a slight and apparently nonsubstantive modification in its digest, striking the word "extracurricular" and substituting in its place the word "athletic."[9] The Legislative Counsel's Digest made no reference either to the provision at issue herein or to the new final sentence.

 Committee reports are often useful in determining the Legislature's intent. (*People* v. *Cruz* (1996) 13 Cal.4th 764, 773-774, fn. 5 [55 Cal.Rptr.2d 117, 919 P.2d 731].) As explained in an Assembly Education Committee report on Assembly Bill No. 1690, the Legislature was concerned with the prospect of temporary employees gaining probationary status while serving as athletic coach: "Current law makes provision for the classification of certificated employees as temporary employees in a number of specified circumstances." "Existing provisions regarding temporary employees either state or imply the employment of temporary employees [is] for relatively

---

[9]The second paragraph of the digest, as amended, read: "This bill would add to the circumstances under which a certificated individual could be classified as a 'temporary' employee, cases in which a person was employed to serve in a limited assignment supervising the extracurricular *athletic* activities of pupils. The bill would not limit such classification to employment for terms of any specified length." (Legis. Counsel's Dig., Assem. Bill No. 1690, 3 Stats. 1977 (1977-1978 Reg. Sess.) as amended June 1, 1977.)

short time periods. Employment beyond those periods generally leads to probationary status." (Assem. Ed. Com., Rep. on Assem. Bill No. 1690 (1977-1978 Reg. Sess.) May 16, 1977, p. 1.) A subsequent Assembly Education Committee report is more specific: "According to current statutes, part-time teachers become eligible for probationary status (3 years on probation are needed for tenure) if they teach for two consecutive semesters in a given school year. [When these individuals gain such probationary status,] [*p*]*roblems arise because the regular teaching positions are not available for them to fill . . . .* With the growing popularity of new sports such as soccer, additional coaches are needed on a part-time basis. Flexibility is needed to allow for their remaining non-probationary and non-permanent while in such assignments." (Assem. Ed. Com., Rep. on Assem. Bill No. 1690 (1977-1978 Reg. Sess.) June 1, 1977, pp. 1-2, italics added.)

The District argues that the Legislature, by first adding subdivision (b) to section 44919 and then amending the new subdivision, "[c]learly . . . intended to broaden the circumstances in which individuals could be hired as 'temporary' employees." We agree. We further agree the Legislature, by amending section 44919, intended to give school districts greater flexibility in hiring athletic coaches. The expressed concern, however, was not that districts were hampered in hiring the "best available" athletic coaches. The concern, rather, was with the consequences of hiring certificated temporary employees as athletic coaches for more than three months. Certificated temporary employees thus hired would be converted from temporary to probationary status and thereby become entitled to reemployment in positions that would not always be available the next year. This was the potential problem the amendment of section 44919 was designed to address. With one minor exception (discussed, *post*), neither the Legislative Counsel's Digest nor the committee reports indicate the Legislature believed one way or the other concerning whether it was creating an employment preference for credentialed teachers.[10]

To the extent the legislative history mentions the employment preference issue at all, it cuts against the District's position. A staff analysis

---

[10]The dissent makes much of the fact the Legislative Counsel's Digest does not mention the key statutory language. (Dis. opn., *post*, at p. 661.) From this, the dissent concludes the Legislative Counsel considered "the new language was merely a clarification, not a major change in the bill and the overall statutory scheme." (*Id.* at pp. 661-662.) The issue clarified, according to the dissent, is that even after the amendment districts could hire permanent teachers as coaches. (*Id.* at p. 663.) Why this point needed "clarification," the dissent fails to say. Nor does the dissent's theory explain the Legislative Counsel's Digest's similar silence concerning the new final sentence of section 44919(b), which for the first time expressly excluded service in a limited assignment from the service required to attain a classification as a permanent employee.

In any event, from the Legislative Counsel's Digest's silence, apparently, the dissent concludes the Legislature intended the key statutory language in section 44919(b) to mean

of Assembly Bill No. 1690, prepared for the Senate Committee on Education, summarizes the bill and states: "[According to the bill], [t]*he district must offer these assignments to their regular teachers before hiring such temporary coaching assistance.*" (Sen. Com. on Ed. Analysis of Assem. Bill No. 1690 (1977-1978 Reg. Sess.) Aug. 17, 1977, p. 1, italics added.) Although we hesitate to accord much weight to an anonymous staff report that was merely summarizing the effect of a proposed bill (but see *People* v. *Cruz, supra,* 13 Cal.4th at p. 780, fn. 9 [granting judicial notice of legislative staff analyses]), the report is, nevertheless, fully consistent with our conclusion the Legislature intended to create an employment preference for teachers currently employed in the district.

That the Legislature intended to provide districts more flexibility when hiring athletic coaches does not of necessity negate the employment preference to "teachers presently employed in the district" created by the plain language of section 44919(b). Indeed, were that the case, no purpose would have been served in amending Assembly Bill No. 1690, as it was originally proposed, to state such a preference. In any event, the available legislative history, such as it is, offers no evidence the Legislature believed it was important (as the District contends) *to notify* teachers of a coaching vacancy, or that the Legislature believed the import of the 1977 amendment of section 44919(b) was to require such notice. We thus conclude the legislative history is generally unhelpful, but to the extent it sheds any light on this issue at all, such history indicates the District's proposed interpretation of section 44919(b) is incorrect.

The District's final arguments are even less weighty. It argues we should construe section 44919(b) within a broader constitutional and statutory framework, noting the state Constitution grants the Legislature power to authorize school districts to exercise broad powers (Cal. Const., art. IX, § 14), and that the Legislature has done so in section 35160. That section provides: "[T]he governing board of any school district may initiate and carry on any program, activity, or may otherwise act in any manner which is not in conflict with or inconsistent with, or preempted by, any law. . . ." (*Ibid.*) By this statute, the Legislature intends to "give school districts . . . broad authority to carry on activities and programs . . . which, in the determination of the governing board of the school district, . . . are necessary or desirable in meeting their need and are not inconsistent with the

school districts need only post notice of the coaching vacancies, but need not afford teachers any other advantage in the employment process. This chain of reasoning, which begins with the Legislative Counsel's silence and ends with an interpretation that is nowhere mentioned in the words of the statute or the available legislative history, is too tenuous a basis on which to arrive at the proper interpretation of section 44919(b).

purposes for which the funds were appropriated." (§ 35160.1, subd. (b).) Regarding athletics, as noted, *ante*, section 35179, subdivision (a) specifically gives to "[e]ach school district governing board [the] general control of, and [the] responsib[ility] for, all aspects of the interscholastic athletic policies, programs, and activities in its district, including, but not limited to, eligibility, season of sport, number of sports, *personnel*, and sports facilities." (Italics added.)

The District contends a consideration of article IX, section 14 of the state Constitution, as well as sections 35160, 35160.1, and 35179, should lead us to conclude the Legislature intended to confer broad power on school districts and that statutes such as section 44919(b) should be liberally construed in the District's favor. As discussed above, we agree the Legislature has delegated broad discretion to the individual districts. These broad grants of power, however, do not control over the more specific section 44919(b), which expressly governs the employment of temporary employees for the limited "assignment supervising athletic activities of pupils." (See *California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1154 [43 Cal.Rptr.2d 693, 899 P.2d 79] [general rule allocating burden of proof does not take precedence over more specific rules established by statute or judicial decision].) Section 35179 itself recognizes this broad grant of power to school districts may be limited by other statutes, for the last sentence of subdivision (a) of that section provides the governing boards of each school district "shall assure that all interscholastic policies, programs, and activities in its district *are in compliance with state . . . law.*" (Italics added.)

Finally, the District contends the Legislature has recognized, through numerous statutes, the importance of physical education and, accordingly, has placed it "on equal ground with other elements of the public school curriculum." To effectuate this policy decision, claims the District, "California schools have always endeavored to hire the most qualified teachers <u>and</u> the highest quality athletic coaches." (Underscoring in original.) Requiring school districts to hire less than the best, it claims, is contrary to this policy. This contention is echoed by amicus curiae Templeton Unified School District (Templeton). Templeton argues public policy demands school districts have the "right to hire the most qualified coach available"; in oral argument, counsel for Templeton opined that the controlling public policy is "excellence . . . in athletics."

To begin with, it is unclear what is meant by "excellence . . . in athletics," and how that term applies in the educational setting. To the extent the

District and Templeton contend their "best coach" policy means school districts should be free to hire nonteachers who they believe have the best chance of producing winning seasons for their sports teams, the argument fails to consider that athletic activities in a public school setting reasonably may be seen as pedagogical as well as physical. In other words, the question is not simply one of "excellence in athletics" for its own sake, whatever that may mean. Instead, the "best coach" in a public school setting may be defined as one who can achieve *multiple goals*, not just winning seasons.

Neither the District nor Templeton persuasively identifies how it has determined "public policy" requires we value one aspect of coaching ability (what they term "excellence") over all other valuable characteristics a coaching applicant might bring to bear, including the training and skills reflected in successfully obtaining a teaching certificate. We have not found, nor has the District or Templeton cited, any clearly stated legislative policy supporting the notion that school districts should be free in all instances to hire the "best" athletic coach available, and to define that term solely as a matter of athletic achievement and success. Instead, the District gleans this vague, unstated policy from a synthesis of a variety of statutes governing athletic activities in our schools. (See, e.g., §§ 51210, subd. (g) [adopted course of study for grades 1-6 "shall include" physical education], 51220, subd. (d) [adopted course of study for grades 7-12 "shall offer courses" in physical education], 51206 [for public elementary schools, physical fitness "is of equal importance to that of other elements of the curriculum"], 51223.5, subd. (a) [same], 51223.5, subd. (b) [grades 1-8 shall either "(e)mploy a physical education specialist" or provide each teacher with analogous training].)

This unstated alleged policy to hire the "best" available coach is insufficient to counterbalance the *express* statement in section 44919(b) giving credentialed teachers currently employed in the district an employment preference for athletic coach positions. This express direction suggests the Legislature intended schools, whenever possible, to hire qualified coaches who already possess the skills of a teacher. Had the Legislature intended that coaches who excelled only in athletic competency should prevail, adding the second part of section 44919(b) would have been unnecessary. While our Legislature certainly might make such a policy choice, that it has done so is not evident in the Education Code. One searches the code in vain for any statement of legislative intent that districts should hire "the best coach available." We reiterate that "[i]n construing . . . statutory provisions a court . . . may not rewrite the statute to conform to *an assumed intention which does not appear from its language.*" (*People v. One 1940 Ford V-8 Coupe, supra,* 36 Cal.2d at p. 475, italics added.)

Our interpretation of section 44919(b), giving "teachers presently employed by the district" an employment preference when it comes to hiring athletic coaches, is, moreover, as supported by a reasonable public policy decision as is the District's (and Templeton's) proffered "best available coach" policy. As indicated above, the "best coach" in a public school setting may be one who serves goals beyond merely producing a winning team. For example, the Legislature may have believed teachers already employed in the district would not place undue emphasis on a student's athletic achievements to the detriment of the student's academic studies. The Legislature may also have believed it was to students' benefit to see their teachers performing in nonacademic surroundings, modeling a balance of academic and nonacademic activities students will have to achieve as adults. The Legislature may have believed having teachers serve as coaches would foster a sense of community at the school, and thereby foster greater respect for the school and the teachers.[11]

We emphasize that, although these statements of public policy support our interpretation of section 44919(b), none is expressly stated. We identify them for two reasons. First, they reveal that our interpretation of section 44919(b) could be supported by a reasonable public policy. Second, although it is certainly *possible* the Legislature could have a policy of desiring school districts to hire the "best available" coach, it may have determined that the "best coach" preferably would be one with a teaching credential and the concomitant training and ability. Because none of these policy choices are apparent from the Education Code, we reiterate that due respect for the power of the Legislature and for the separation of powers directs we follow the public policy choices actually discernible from the Legislature's statutory enactments, amendments and deletions, namely: (i) that teachers should enjoy some tangible advantage in the hiring process for athletic coach positions; and (ii) that districts retain control over setting the qualifications for coaching positions, as well as retain the evaluative function when choosing coaches according to the criteria thus established.[12]

Templeton and the dissent both argue an interpretation of section 44919(b) to require school districts to give an employment preference to

---

[11]The dissent perceives an expression of legislative policy to hire the "best" coach available in section 33080's declaration that the purpose of the state's educational system is to "enable each child to develop all of his or her own potential." It hardly bears mentioning that this exceedingly general statement of the purpose of the educational system is insufficient to outweigh the express statement in section 44919(b) granting teachers an employment preference. Certainly the dissent cites no cases in which section 33080 has been used to invalidate more specific legislative pronouncements. Nor, as indicated above, do we perceive any necessary conflict between section 33080 and our interpretation of section 44919(b).

[12]The dissent states that "[m]andatory employment preferences deemphasize merit" (dis. opn., *post*, at p. 662), thereby suggesting we should refuse to find such preferences. The dissent also labels section 44919(b)'s employment preference for teachers "artificial" (dis.

teachers currently working in the district is absurd, because such teachers may be terminated from such extra-duty assignments "at any time" pursuant to section 44923. The Court of Appeal declined to resolve this question, explaining that because the District never hired Stanley, the question was a mere hypothetical not posed on the facts of this case. We agree; we are here concerned with a teacher's rights to be hired as an athletic coach, not a district's rights under other statutes to terminate an employee.

Nevertheless, we note section 44923's provision that tenured teachers can be terminated from any extra-duty assignments "at any time" is not inconsistent with the hiring preference granted teachers under section 44919(b). To begin with, section 44923 apparently governs *all* extra-duty assignments, whereas section 44919(b) specifically addresses the hiring of athletic coaches only. Second, authorizing districts in section 44923 to terminate teachers from extra-duty assignments "at any time" merely places teachers on roughly equal footing with noncredentialed employees who may be hired for the same position. Section 44954, subdivision (a) permits school districts to "release temporary employees . . . [¶] . . . [a]t the pleasure of the [governing] board prior to serving during one school year at least 75 percent of the number of days the regular schools of the district are maintained." In light of this liberal right to terminate temporary employees, section 44923 may be viewed as the Legislature's attempt to ensure that teachers who are hired as coaches take such positions subject to the same general rules regarding termination as temporary employees, when both work in extra-duty assignments.

Accordingly, we find the language of section 44919(b), read in context and with due respect for the Legislature's expressed educational policy choice delegating ample discretion to school districts, requires that school districts first consider the applications of credentialed teachers currently employed in the district before considering walk-ons. Only if such teachers are found unqualified *under applicable qualifications standards as promulgated by the district* may a district consider walk-ons.

## CONCLUSION

We hold section 44919(b) establishes, for limited-duty assignments of athletic coach, a limited employment preference for credentialed teachers

opn., *post*, at p. 662.), thereby implying the preference is unjustified or lacking a basis in reality. Finally, the dissent opines that "[p]ublic school athletes need and deserve the best available coaches." (*Ibid.*) From these statements, it appears the dissent is expressing its own policy choices. While one might, as a personal matter, agree with these sentiments, the choice is not for this court to make. An even casual acquaintance with the issue of the proper regulation of public education in this state reveals the topic is fraught with conflicting policy choices. Proper appreciation of our judicial role dictates we leave these decisions to the political branches of our state government.

presently employed by the school district, a preference conditioned on such a teacher applying for the position and meeting the qualifications established by the school district. Because the record does not indicate whether Stanley's application for one of the coaching vacancies was rejected because he failed to meet the District's qualifications, the judgment of the Court of Appeal directing the trial court to issue a writ of mandate is vacated and the matter transferred to the Court of Appeal with directions to remand the case to the trial court for further proceedings consistent with this opinion.

George, C. J., Mosk, J., and Kennard, J., concurred.

**CHIN, J.,** Dissenting.—Education Code section 44919, subdivision (b) (section 44919(b)), provides as relevant: "Governing boards shall classify as temporary employees persons, other than substitute employees, who are employed to serve in a limited assignment supervising athletic activities of pupils; *provided, such assignment shall first be made available to teachers presently employed by the district.*" (Italics added.)[1] Plaintiffs California Teachers Association et al. (collectively CTA) claim, and the Court of Appeal agreed, that the italicized language gives teachers a right of first refusal over public school coaching positions, and that a local school district may not hire a nonteacher—no matter how outstanding—as a coach if a single teacher anywhere in the district applies for the position.

The majority rejects this contention, correctly in my view. But in its place, it gives the 15 words at issue a tortured interpretation divorced from any meaning drawn from the words themselves. The statute, the majority says: (1) provides teachers "some tangible advantage in the hiring process" (maj. opn., *ante,* at p. 635); but (2) a local district may "promulgate[]" "regulations" (*id.* at p. 644) establishing whatever minimum qualifications, including "intangibles" (*id.* at pp. 640-641), the district desires; (3) if the district does not promulgate regulations, it must hire a teacher, no matter how poorly qualified, over a nonteacher, no matter how outstanding; but (4) if the district does promulgate regulations, it may reject a teacher applicant if it finds the applicant is unqualified under those regulations; however, (5) the district must measure any teacher applicant against these qualifications before it may even "consider" (*ibid.*) nonteacher applicants; and, (6) if any teacher meets these minimum standards, it must hire the teacher and may never "consider" any nonteacher applicants. (See also *id.* at p. 652.)

---

[1]In its entirety, section 44919(b) provides: "Governing boards shall classify as temporary employees persons, other than substitute employees, who are employed to serve in a limited assignment supervising athletic activities of pupils; provided, such assignment shall first be made available to teachers presently employed by the district. Service pursuant to this subdivision shall not be included in computing the service required as a prerequisite to attainment of, or eligibility to, classification as a permanent employee of a school district."

Whatever the statutory language means, it surely does not mean all this. The language is far from a stellar example of statutory drafting, but, reasonably construed, it merely means that before the district may hire a nonteacher as a coach, it must first make vacant coaching assignments accessible to teachers by posting or otherwise giving notice so teachers are aware of the positions and may compete for them on an equal basis with nonteachers. Stated differently, the district may not hire an outsider before first making the position available to teachers in this fashion.

The trial court correctly found that the district did make the coaching positions available to Gary Stanley within the meaning of section 44919(b). The Court of Appeal erred in reversing the judgment denying the petition for writ of mandate. Hence, I would reverse the judgment of the Court of Appeal.

## I. FACTS

The relevant facts are straightforward. The Rialto Unified School District (district) hired Martin Sipe, a credentialed teacher, as the boys varsity basketball coach and athletic director of a new district high school. Previously, Sipe had been the coach at an older high school in the district. The district hired as Sipe's assistant coach the same person—a nonteacher—who had previously been Sipe's assistant at the other school. At Sipe's recommendation, the district also hired a nonteacher as the assistant coach of the freshman team. The individual plaintiff in this case, Stanley, a teacher in the district, received flyers concerning these coaching positions and unsuccessfully applied for them. Stanley, joined by the California Teachers Association and the Rialto Education Association, filed a petition for writ of mandate, seeking an injunction prohibiting the district from hiring a nonteacher as a coach if any teacher in the district wanted the position. The petition also sought damages.

The trial court denied the petition, finding that section 44919(b) "does not require that a teacher already employed in the District *must* get a coaching position to the exclusion of all others if he or she applies," and that "The District first made the position available to Petitioner Stanley by advertising it to current teachers already employed in the District and by interviewing Mr. Stanley for the position before hiring a non-certificated District employee." (Original italics.) The CTA prevailed in the Court of Appeal, which held that, before a coaching position "may be offered to anyone not then employed by the district as a teacher, the assignment must have been offered to and refused by any teacher then employed by the district who had applied for the assignment." We granted the district's petition for review.

## II. Discussion

I would reverse the judgment of the Court of Appeal. That court read and, in a different way, the majority reads, far more meaning into the language "first . . . made available" than is warranted.

### A. *Plain Meaning*

The linchpin of the CTA's position seems to be that the statute has an unambiguous plain meaning. It argues that the phrase "shall first be made available" can only mean that teachers have a right of first refusal, and a nonteacher may be hired only if no teacher applies for the position. The Court of Appeal agreed, finding "this meaning is clear from the words of the statute themselves . . . ."

On the contrary, the language is not at all plain and requires interpretation. Although the Court of Appeal's interpretation is plausible (I discuss below the majority's interpretation), it is not the only possible one. If the statute had said, "shall first be made available to teachers presently employed by the district, and all such teachers shall have a right of first refusal," it would have been clear and would have compelled the Court of Appeal's interpretation. It did not. It merely said coaching positions "shall first be made available" to teachers. Black's Law Dictionary gives several one-word synonyms for "available," one being "accessible." (Black's Law Dict. (6th ed. 1990) p. 135, col. 1.) The phrase "made available" can readily be interpreted to mean make accessible by "posting," as it is used in other statutes, or otherwise giving notice to teachers. (E.g., Health & Saf. Code, § 34332, subd. (h)(4) ["posted or made available"]; Civ. Code, § 7100, subd. (a) ["available and posted"].)

The majority finds my interpretation "implausible" (maj. opn., *ante*, at p. 633) for three reasons, none of which withstands scrutiny. First, it argues the Legislature could have more clearly expressed the intent merely to make the positions accessible. (*Id.* at p. 634.) It certainly could have used clearer language. But the lack of clarity does not rule out my interpretation any more than it rules out the Court of Appeal's or the majority's, which are also not clearly stated.

Second, the majority asserts my interpretation would make section 44919(b) "a nullity, for it would then give teachers no greater rights than they would have in the absence of the statute" because "nothing would prevent such teachers from learning of an opening for athletic coach and applying to fill the opening." (Maj. opn., *ante*, at p. 634.) This assertion is

simply incorrect, as the facts of this case suggest. The district hired as the assistant coach the same person who assisted the same head coach at the established high school. Absent the statute, it is conceivable the district might merely have hired that assistant for the new position without further ado, and without sending out flyers, which would have prevented teachers from applying and competing for the position. The statute, however, guaranteed that teachers could compete on equal terms with the assistant coach and any other nonteacher applicant. This interpretation does not make it a nullity. The statute has content without finding that it somehow gives teachers an unspecified advantage in the hiring process.

Third, and finally, the majority asserts my interpretation fails to give meaning to the word "first." (Maj. opn., *ante*, at pp. 634-635.) This is also incorrect. The majority states that "clearly" the word " 'first' " means first in "priority." (*Id.* at p. 634.) It never suggests where this asserted clarity can be found. Simply asserting something is "clear" does not make it so. "First" can also mean first in *time*. First in time merely means that a district could not hire an outsider before "first" making the position accessible to teachers so they could apply and compete for it on an equal basis. To give the word that meaning, and no more, does not render it surplusage. Nothing in the statutory language gives teachers an advantage in the hiring process, just the opportunity to compete equally for the position.

If section 44919(b) does indeed have a plain meaning different from the one I urge, it is strange no one discovered it sooner. The subdivision was enacted in 1977. (Stats. 1977, ch. 565, § 1, pp. 1795-1796.) No one asserted any of the currently urged meanings until this litigation nearly two decades later. Both the CTA's position and the majority's interpretation are revisionist history.

As I discuss further below, during the legislative process, the Legislative Counsel totally overlooked the meanings urged today. Moreover, they are inconsistent with regulations of the State Board of Education and the decision in *San Jose Teachers Assn.* v. *Barozzi* (1991) 230 Cal.App.3d 1376 [281 Cal.Rptr. 724] (*Barozzi*). In 1988, the State Board of Education promulgated California Code of Regulations, title 5, section 5592 (Regulation 5592), which provided: "The governing board of any school district may use a noncertified temporary athletic team coach as defined in Section 5590 to supervise and instruct in interscholastic athletic programs and activities subject to the following general conditions: [¶] (a) An annual search among the district's certificated employees has not identified coaching personnel able to fulfill the district's coaching needs." In *Barozzi*, the Court of Appeal

*invalidated* the annual search condition on the ground it impermissibly infringed on local school districts' authority to hire whom they wanted as coaches. (*Barozzi, supra*, 230 Cal.App.3d at p. 1379.) Ironically, under any of the new interpretations of section 44919(b), the *Barozzi* court invalidated the wrong part of the regulation. Instead of limiting local authority too much, as the *Barozzi* court found, the regulation does not limit it enough. The plaintiff San Jose Teachers Association, a subdivision of the CTA (*Barozzi, supra*, 230 Cal.App.3d at p. 1378), missed the interpretation it urges today, even though it might have resulted in a greater victory than the relatively modest one it vainly sought.

Thus, the Legislative Counsel, the State Board of Education, the Court of Appeal in *Barozzi, supra*, 230 Cal.App.3d 1376, and, until this case, even the CTA all overlooked the meanings urged today. Only now, some two decades after the language was enacted, have they been belatedly asserted. The reason is clear; these meanings did not and do not exist.

Whenever the Legislature has actually intended to establish a right of first refusal or an employment preference, it has stated that intent in clear, unmistakable language. The majority admits this to be the case (maj. opn., *ante*, at pp. 641-643), but "find[s] no significance" in this circumstance (*id.* at p. 643) because "the Legislature has used a different phraseology in each instance." (*Ibid.*) On the contrary, the difference between clear language and ambiguous language is quite "significan[t]." The fact the Legislature has consistently used clear language to establish a right of first refusal or other employment preference shows it knows how to do so and strongly indicates that, when the language is not clear, the Legislature did not intend to establish such a preference.

The conclusion is inescapable: The wording does not have a clear, unambiguous, plain meaning, and certainly none of the meanings urged for the first time in this litigation. Statutory construction is necessary.

## B. *Statutory Construction*

Traditional "rules" of statutory construction often point in conflicting directions. Indeed, it is sometimes suggested that one can cite a rule to support virtually any interpretation. Here, however, once we recognize the ambiguity of the statutory language, all the rules support a narrow reading.

### 1. *The Statutory Scheme as a Whole*

"The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same

subject must be harmonized, both internally and with each other, to the extent possible." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) It is "a cardinal rule of statutory construction, that 'every statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect.' " (*Landrum* v. *Superior Court* (1981) 30 Cal.3d 1, 14 [177 Cal.Rptr. 325, 634 P.2d 352].)

The California Constitution empowers the Legislature to "authorize the governing boards of all school districts to initiate and carry on any programs, activities, or to otherwise act in any manner which is not in conflict with the laws and purposes for which school districts are established." (Cal. Const., art. IX, § 14, 2d par.) The Legislature has exercised this power and granted local school districts broad authority, both generally, and specifically regarding hiring coaches. It enacted a statute substantially identical to California Constitution, article IX, section 14. (Ed. Code, § 35160.) It also found and declared that "school districts . . . have *diverse needs unique to their individual communities and programs.* Moreover, in addressing their needs, common as well as unique, *school districts . . . should have the flexibility to create their own unique solutions.*" (Ed. Code, § 35160.1, subd. (a), italics added.) It went on to state expressly its intent to give school districts "*broad authority* to carry on activities and programs . . . which, in the determination of the governing board of the school district, . . . are necessary or desirable in meeting their needs . . . . It is the intent of the Legislature that Section 35160 be *liberally construed* to effect this objective." (Ed. Code, § 35160.1, subd. (b), italics added.)

Consistent with this "broad" general grant of authority to local districts to act as local conditions dictate, the Legislature spoke on the specific question here, hiring coaches: "Each school district governing board shall have general control of, and be responsible for, *all aspects* of the interscholastic athletic policies, programs, and activities in its district, including, but not limited to, eligibility, season of sport, number of sports, *personnel*, and sports facilities." (Ed. Code, § 35179, subd. (a), italics added.) In *Barozzi*, the Court of Appeal cited this language to find that the Board of Education had no authority to require the annual review provided in Regulation 5592. (*Barozzi, supra*, 230 Cal.App.3d at p. 1383.)

In combination, these statutes express a clear legislative policy: Personnel decisions regarding athletic programs are solely for local school districts to make, considering local needs and conditions. Section 44919(b) must be interpreted in light of this clear policy. Did section 44919(b) dramatically

restrict the authority of local school districts over coaching personnel decisions, or did it merely require advance posting and an opportunity for teachers to compete? The latter interpretation is consistent with the entire statutory scheme, the former a jarring departure.

Yet another statute supports a narrow reading of section 44919(b). Education Code section 44923 provides: "In the event a permanent employee of a school district has tenure as a full-time employee of the district, any assignment or employment of such employee in addition to his full-time assignment may be terminated by the governing board of the district *at any time*." (Italics added.) This language reaffirms the district's authority over coaching assignments, even as to tenured teachers. My interpretation of section 44919(b) meshes neatly with section 44923. Teachers and nonteachers compete equally, and the district may hire and terminate all equally. Granting teachers a right of first refusal or other hiring preference would raise many problems. If section 44919(b) forces a district to hire a teacher rather than a superior nonteacher candidate, could the district then immediately "terminate[]" that assignment under section 44923? If so, must it then *rehire* the same teacher to fill the newly created vacancy? Or does section 44919(b) give a teacher only a one-time preference (which interpretation would effectively render section 44919(b) nugatory, while requiring the charade of hiring, then firing, a teacher in order to hire a superior nonteacher candidate)? The CTA's and the majority's interpretations place sections 44919(b) and 44923 in perpetual war with one another. Mine harmonizes them.

## 2. *History of the Statutory Language*

"Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com., supra,* 43 Cal.3d at p. 1387.)

The context and history of section 44919(b) show the language at issue was intended only to be a minor clarification, not a dramatic departure from settled legislative policy. When Education Code section 44919 was first enacted in 1976, effective April 30, 1977, it did not contain subdivision (b). (Stats. 1976, ch. 1010, § 2, pp. 3434-3435.) It provided (and still does in subdivision (a)) that school districts may employ persons for a temporary time period of either three or four months, depending on the type of assignment, but that if the duties continue for a longer time, the temporary employee "shall be classified as a probationary employee." This provision

meant that a school district could only hire an outside coach for a few months before that coach became a probationary employee.

Assembly Bill No. 1690 of the 1977-1978 Regular Session (Assembly Bill No. 1690) was introduced to address this problem and to increase the flexibility of local districts to employ outside coaches. It added section 44919(b). In its original version (Apr. 14, 1977), that subdivision provided only: "Governing boards shall classify as temporary employees persons, other than substitute employees, who are employed to serve in a limited assignment supervising the extracurricular activities of pupils." The new language, however, could have created a new problem, indeed the opposite problem of the one being solved. The language was ambiguous as to whether local districts could even hire permanent teachers as coaches. It could be read as providing that if a district employed a tenured teacher to serve in a limited assignment (e.g., as a coach), it would have to reclassify that teacher as a temporary employee. If the governing board "shall" classify persons employed as coaches as "temporary," could teachers accept work as coaches without losing their permanent status? An amendment to the bill was necessary to clarify this point.

Assembly Bill No. 1690 was therefore amended once, to change section 44919(b) to read as it now does. (Assem. Amend. to Assem. Bill No. 1690 (1977-1978 Reg. Sess.) June 1, 1977.) The amendment solved the problem by making clear that local districts could continue to hire teachers as well as outsiders as coaches. It thus gave local districts maximum flexibility. There is no hint the Legislature intended the amendment to do more or to limit this flexibility. The new language ensured that coaching positions would continue to be made available to teachers while providing that teachers could take coaching positions without risk that their permanent status would change to temporary. The bill as a whole was designed to aid, not hamper, school officials in their quest for good coaches, whether within or outside the teaching ranks.

Given this history, we should not interpret the bill to deprive local districts of the very flexibility it was intended to give and that other statutes expressly provide. I am "not persuaded the Legislature would have silently, or at best obscurely, decided so important and controversial a public policy matter and created a significant departure from the existing law." (*In re Christian S.* (1994) 7 Cal.4th 768, 782 [30 Cal.Rptr.2d 33, 872 P.2d 574].)

### 3. *Legislative Counsel's Digest*

"The Legislative Counsel's Digest is printed as a preface to every bill considered by the Legislature." (*Southland Mechanical Constructors Corp.* v.

*Nixen* (1981) 119 Cal.App.3d 417, 428, fn. 5 [173 Cal.Rptr. 917].) The Legislative Counsel is a state official required by law to analyze pending legislation to assist the Legislature in considering that legislation. (*California Assn. of Psychology Providers* v. *Rank* (1990) 51 Cal.3d 1, 17 [270 Cal.Rptr. 796, 793 P.2d 2]; *People* v. *Martinez* (1987) 194 Cal.App.3d 15, 22 [239 Cal.Rptr. 272].) Therefore, "It is reasonable to presume that the Legislature amended those sections with the intent and meaning expressed in the Legislative Counsel's digest." (*People* v. *Superior Court* (*Douglass*) (1979) 24 Cal.3d 428, 434 [155 Cal.Rptr. 704, 595 P.2d 139]; see also *Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1158, fn. 6 [278 Cal.Rptr. 614, 805 P.2d 873].) Indeed, we have stated that the rule that opinions of the Attorney General are entitled to " 'great weight' " "is particularly compelling as to opinions of the Legislative Counsel, since they are prepared to assist the Legislature in its consideration of pending legislation." (*California Assn. of Psychology Providers* v. *Rank, supra*, 51 Cal.3d at p. 17; see also *Franklin* v. *Appel* (1992) 8 Cal.App.4th 875, 890 [10 Cal.Rptr.2d 759] [applying this rule to the Legislative Counsel's Digest].)

The reaction of the Legislative Counsel toward the language at issue here—"such assignment shall first be made available to teachers presently employed by the district"—is quite remarkable. As explained above, Assembly Bill No. 1690 did not contain this language at first. When the bill was originally introduced without this language, the Legislative Counsel's Digest summarized the significance of the entire new section 44919(b). It explained concisely that section 44919(b) "would add to the circumstances under which a certificated individual could be classified as a 'temporary' employee, cases in which a person was employed to serve in a limited assignment supervising the extracurricular activities of pupils. The bill would not limit such classification to employment for terms of any specified length." (Legis. Counsel's Dig., Assem. Bill No. 1690 (1977-1978 Reg. Sess.) Apr. 14, 1977, p. 138.) The bill was then amended to add the language at issue. However, the Legislative Counsel changed the digest only by replacing the words "the extracurricular" with "athletic" to reflect another change in the amendment.

*The Legislative Counsel's Digest did not make the slightest mention of the language that is at the heart of this litigation.*

The explanation is obvious. As discussed *ante*, at page 660, the new language was merely a clarification, not a major change in the bill and the overall statutory scheme. The Legislative Counsel recognized it as such. Before the bill, local districts could hire permanent teachers as coaches. The amendment assured that this practice would continue. If the Legislature had

intended the major piece of legislation urged today, surely the amendment would have registered at least a blip on the Legislative Counsel's radar screen.

### 4. *Policy*

Obviously, the Legislature establishes policy, not this court. However, "Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.*, *supra*, 43 Cal.3d at p. 1387.) " 'A statute should be interpreted so as to produce a result that is reasonable. [Citation.] If two constructions are possible, that which leads to the more reasonable result should be adopted.' " (*Granberry* v. *Islay Investments* (1984) 161 Cal.App.3d 382, 388 [207 Cal.Rptr. 652].)

Adding bureaucratic red tape and tying the hands of local administrators are bad policies. Mandatory employment preferences deemphasize merit. A requirement that school districts hire any teacher who meets minimum qualifications over a superior nonteacher candidate would harm California's public schools. Teaching classes and coaching interscholastic sports are quite different undertakings. Many teachers make excellent coaches. Often a teacher applicant will be the best available choice and should be hired. Local school districts should not be discouraged from hiring teachers as coaches. But, by the same token, sometimes a nonteacher is the best candidate. Sometimes, as here, the nonteacher is already an assistant coach in the district; an artificial preference should not prevent the district from retaining a deserving assistant. Sometimes a veteran assistant might apply for promotion to head coach when that coach retires; again, an artificial preference should not prevent a deserved promotion. Public schools should be allowed to use to the fullest the tremendous pool of outside coaching talent. Public school athletes need and deserve the best available coaches.

The CTA would prohibit a district from hiring a nonteacher if a single teacher anywhere in the district applied. The majority would prohibit a district from even *considering* outside applicants unless and until it found all teacher applicants unqualified. For prestigious positions such as head football coach of a high school in a large district like Los Angeles—with thousands of teachers—either view would effectively mean that nonteachers need not apply (unless, under the majority view, the district is prepared to declare every teacher applicant unqualified before it even considered outside applicants). A school district that wanted to revive a moribund program by hiring an Olympic wrestler, or a former professional basketball player, or an

alumnus who had coached in the National Football League, would be stymied if a single minimally qualified teacher anywhere within the district applied for the position. Stanford University could hire a distinguished alumnus to coach its football team, but it would be a rare public school, especially in a large urban district, that could do so.

Public schools should aim as high as the applicant pool allows. They should not be forced to hire any teacher who meets the minimum established standards. Excellence must not be reserved for private schools.

## C. *The Majority's Interpretation*

The majority "reiterate[s] that '[i]n construing . . . statutory provisions a court . . . may not rewrite the statute to conform to *an assumed intention which does not appear from its language.*' " (Maj. opn., *ante*, at p. 650, italics added by the majority.) I agree. Yet that is essentially what the majority does. It asserts "the Legislature *clearly intended* to afford some degree of advantage or priority to" teachers (*id.* at p. 634, italics added) without ever identifying where this "clear[]" intent is supposed to be found, and it rewrites the statute to conform to that asserted intention. What is most clear about this statute is that it is not clear.[2] The majority's interpretation finds no support in the statutory language, any credible method of statutory interpretation, or policy.[3]

Apparently relying on a statute that did not yet exist when section 44919(b) was enacted, and that has since been repealed (Ed. Code, former

---

[2] The majority cannot decide whether it claims the plain or express statutory language compels its conclusion, or whether it recognizes it is interpreting an ambiguous statute. (Compare maj. opn., *ante*, at pp. 632 ["we are called upon to interpret a legislative enactment whose meaning is not as clear as the parties, and the appellate courts, would like"], 642 [referring to the "Legislature's failure to use unambiguous language" and recognizing that "the Legislature's choice of words in section 44919(b) is not as clear as in [other statutes]"], and 645 [agreeing "for purposes of argument . . . the language of section 44919(b) lacks sufficient clarity"] with pp. 648 [referring to the "employment preference . . . created by the *plain language* of section 44919(b)" (italics added)], 650 [a policy to hire the best available coach does not "counterbalance the *express* statement in section 44919(b) giving credentialed teachers . . . an employment preference for athletic coach positions" (original italics)], and 651, fn. 11 [referring to "the express statement in section 44919(b) granting teachers an employment preference"].)

[3] The majority asserts that a statement in a staff analysis of Assembly Bill No. 1690— " '[t]he district must offer these assignments to their regular teachers before hiring such temporary coaching assistance' "—is "consistent" with its interpretation. (Maj. opn., *ante*, at p. 648, italics deleted.) That statement, although itself ambiguous, is arguably consistent with the *Court of Appeal*'s interpretation, but it is *in*consistent with the majority's interpretation. The statement does not suggest the district may or should promulgate regulations to weed out teachers to whom the statute applies or the district may not even *consider* nonteacher applicants.

§ 35179.5 [enacted in 1985, repealed in 1994]; see maj. opn., *ante*, at pp. 637-639),[4] the majority asserts that the statutory phrase, "made available to teachers presently employed by the district," does not apply to all teachers presently employed by the district, but only to those teachers found qualified under whatever intangible standards any local school district chooses to establish. While, as a matter of policy, this reading is at least an improvement on the Court of Appeal's,[5] it is a clear departure from the statutory language. The reference in section 44919(b) to "teachers presently employed by the district" is *unqualified*. My interpretation conforms to this unqualified reference by making coaching positions available, i.e., accessible, to *all* teachers. The majority adds a restriction not in the statutory language.

Without explanation, the majority also adds a new prohibition the parties have never suggested and that has no relation to any statutory language whatever: According to the majority, section 44919(b) somehow requires that the district find all teacher applicants unqualified before it may even "consider" nonteacher applicants. (Maj. opn., *ante*, at pp. 641, 652.) This requirement raises artificial bureaucratic rules to a new level. The word "first"—whatever it means—relates to "employ[ing]" teachers as coaches (see the first clause of the first sentence of § 44919(b)), not merely to "considering" an applicant. Although a district may not "employ[]" a nonteacher before first making the position available to teachers, nothing prevents the district from considering, and even giving notice to and accepting applications from, nonteachers at the same time as it is giving notice to and considering teacher applicants. The majority's new requirement, besides

---

[4]Because Education Code section 35179.5 has been repealed, I do not discuss it in detail. As originally enacted in 1985, it mandated minimum qualifications for nonteacher applicants only, and did not apply to teachers at all. (Stats. 1985, ch. 694, § 1, p. 2306.) Only in 1990 was it amended to cover teachers as well. (Stats. 1990, ch. 1212, § 1, pp. 5077-5078; Ed. Code, former § 35179.5, subd. (d).) The resultant regulations (see maj. opn., *ante*, at pp. 637-638, fn. 5) were therefore targeted primarily at nonteachers, not teachers, and would have screened out few, if any, persons who had earned a teaching credential. Indeed, the Department of Finance opposed the 1990 amendment partly because "Extending the qualifications to credentialed physical education teachers may not be necessary since most recently credentialed teachers have received such instruction through their teacher preparation program." (Dept. of Finance, Analysis of Assem. Bill No. 2063 (1989-1990 Reg. Sess.) May 1, 1990, p. 2.)

[5]The district argues persuasively that requiring it to hire any teacher who applies—including, for example, a kindergarten teacher as varsity football coach despite the lack of knowledge of either coaching or football—as the Court of Appeal interpreted the statute, would have had devastating consequences. The majority dismisses the argument as "fall[ing] of its own weight" because the majority permits the district to establish minimum qualifications. (Maj. opn., *ante*, at p. 644.) The argument, of course, was aimed at the CTA's position and the Court of Appeal's opinion, not the new interpretation the majority proffers today. As the majority implicitly recognizes when it rejects the Court of Appeal's interpretation, the district's argument was right on target.

being sheer invention, would force mental gymnastics probably beyond the limits of normal human capability. In many cases, no matter how hard and how good faith the effort, it would be impossible not even to *consider* nonteacher applicants while evaluating the teacher applicants.

This case presents a good example. Sipe was the head basketball coach and athletic director at the new high school. He would naturally play a major, possibly decisive, role in selecting his own assistant coach. Sipe's assistant at the previous high school applied to be his assistant at the new one. Now the majority says Sipe could not even "consider" that person as his new assistant unless and until all teacher applicants had been found unqualified! To pass this test would require superhuman powers. Until all teacher applicants are rejected, must Sipe guard day and night against letting slip that he was considering making his current assistant his new one? Would Sipe violate section 44919(b), and expose the district to a lawsuit for injunctive relief and damages, if, in a weak moment, he mentioned to a friend, or his spouse, that he considered his assistant an excellent coach? Apparently that is the mandate the majority finds in section 44919(b).

The majority deprives local schools of the control over coaching personnel the Legislature expressly and intentionally gave them. (Ed. Code, §§ 35160, 35160.1, 35179.) The majority responds, "That the Legislature intended to provide districts more flexibility when hiring athletic coaches does not of necessity negate the employment preference to 'teachers presently employed in the district' created by the *plain language* of section 44919(b)," because, "were that the case, no purpose would have been served in amending Assembly Bill No. 1690, as it was originally proposed, to state such a preference." (Maj. opn., *ante*, at p. 648, italics added.) I agree such an amendment would have served no purpose, which is why the Legislature did *not* state such a preference, either by some "plain language" the majority never identifies, or otherwise. There is not and never has been an "*express* statement in section 44919(b) giving credentialed teachers currently employed in the district an employment preference for athletic coach positions." (Maj. opn., *ante*, at p. 650, original italics.)

The majority recognizes that its interpretation may prevent a district from hiring the best candidate as an interscholastic sports coach, but seems untroubled. "One searches the [Education Code] in vain," it says, "for any statement of legislative intent that districts should hire 'the best coach available.' " (Maj. opn., *ante*, at p. 650.) I would have thought it implicit that the Legislature intends the best for our public school children. But the intent is not just implicit, it is expressed: "Each child is a unique person, with unique needs, and the purpose of the educational system of this state is to

enable each child to develop *all* of his or her own potential." (Ed. Code, § 33080, italics added.) Interscholastic sports programs help students develop their potential. Hiring the best available coach helps develop all of this potential. The Legislature does, indeed, intend the best for our children in public schools.

Who might make the "best" possible coach for a given vacancy depends on the circumstances. I do not suggest the district should always hire the person who could lead the team to the highest winning percentage. Often, for reasons the majority identifies, a teacher would make the best coach. (Maj. opn., *ante*, at p. 651.) But sometimes a nonteacher would be the best choice. Each situation is unique. On one occasion, the district might believe the previous coach had emphasized athletics too much and want to hire a teacher who could place the program into proper perspective. On another occasion, the program may be moribund and need an inspirational outsider to revive it. For example, a football team might have had a string of losing seasons due to poor coaching. The program might have become something of a joke to those who could most profit from it, the students themselves. Some students who had the "potential" (Ed. Code, § 33080) to become stellar athletes might ignore the team and maybe even drop out of school altogether. The district might think it important to hire someone, possibly a nonteacher, who could reinstill pride in the team and inspire potential dropouts to join it, to their great benefit both athletically and academically.

Local school districts need and should have the authority to make the best possible coaching personnel decisions after considering the diverse and unique needs of each situation.

This last sentence is not a statement of my policy, it is the *Legislature's*. (Ed. Code, §§ 35160, 35160.1 ["school districts . . . have diverse needs unique to their individual communities and programs"; "in addressing their needs, common as well as unique, school districts . . . should have the flexibility to create their own unique solutions"; therefore, school districts have "broad authority to carry on activities and programs . . . necessary or desirable in meeting their needs"], 35179 [each school district has control of "all aspects of the interscholastic athletic policies, programs, and activities," including "personnel"], 44923.) Section 44919(b) promoted, it did not change, this clearly stated Legislative policy.

## III. CONCLUSION

Today's decision shortchanges our public school students. In this case, a school district sought to achieve some continuity for students forced to

transfer to a newly created high school by making the head and assistant basketball coaches at the established school the coaches at the new one. What it got for its efforts was a lawsuit for injunctive relief and damages, a lawsuit today's opinion validates. I cannot agree.

At a time the public and Legislature are increasingly concerned about the quality of education public school students receive, the majority creates a morass out of 15 ambiguous statutory words. At best, the opinion will merely produce a mountain of red tape, as school districts scramble to promulgate regulations as vague and full of "intangibles" as possible so they can justify rejecting inferior teacher candidates in favor of superior non-teacher candidates, while simultaneously they try to create a record to prove they did not consider the nonteachers until they rejected the teachers. This is bad enough. Schools should concentrate on helping children develop their potential, not on satisfying numbing bureaucratic requirements. More likely, the opinion will lead to ever more litigation that drains school districts' limited financial resources, as teachers bypassed in favor of nonteachers sue for injunctive relief and damages. This is worse. Money earmarked for education should be spent on education, not litigation. At worst, the opinion will actually accomplish what the majority recognizes: It will prevent local school districts from hiring the best available coaches for our young people in public schools.

Fortunately, the damage is correctable. The Legislature merely needs do again what I think it has already done—make clear that it intends the best for our children, and that school districts may hire the best available coaches without fear of being sued. I call upon the Legislature to act promptly to undo today's decision by amending section 44919(b). Although coaching positions should be, and are, available to teachers, so too should they be available to nonteachers. May the best candidate be selected.

Baxter, J., and Brown, J., concurred.