113 Cal.Rptr.2d 107 (2001)
93 Cal.App.4th 218
SHARON S., Petitioner,
v.
The SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
Annette F., Real Party in Interest.
No. D037871.
Court of Appeal, Fourth District, Division One.
October 25, 2001.
As Modified on Denial of Rehearing November 21, 2001.
Review Granted January 29, 2002.
*109 Douglas Shepersky, William Blatchley, San Diego, John L. Dodd & Associates, John L. Dodd, Tustin, and Lisa A. DiGrazia, for Petitioner.
No appearance for Respondent.
Terence Chucas, San Diego, and Judith E. Klein, La Mesa, for Minor.
Leigh A. Kretzschmar, Kathleen Murphy Mallinger, San Diego Luce Forward, Hamilton & Scripps and Charles A. Bird, San Diego, for Real Party in Interest.
Martha Matthews, Oakland, and Katina Ancar on behalf of National Center for Youth Law as Amicus Curiae.
Shannan Wilber, San Francisco, on behalf of Legal Services for Children as Amicus Curiae.
Jordan C. Budd, San Diego, on behalf of ACLU Foundation of San Diego & Imperial Counties, Mark, Los Angeles, on behalf of ACLU Foundation of Southern California, Jennifer C. Pizer, Los Angeles, on behalf of Lambda Legal Defense and Education Fund and Shannon Minter, San Francisco, and Courtney Joslin on behalf of National Center for Lesbian Rights and Children of Lesbians and Gays Everywhere, Family Pride Coalition et al. as Amici Curiae.
Diane Goodman, Encino, on behalf of Academy of California Adoption Lawyers as Amicus Curiae.
*108 McINTYRE, J.
Annette F. petitioned under the independent adoption statutes to adopt Joshua, the biological son of her relationship partner, Sharon S. (the petitioner here). After the women severed their relationship, Sharon sought to terminate the adoption proceedings, arguing in part that the adoption statutes do not permit a second parent, or co-parent, adoption (one in which the unmarried relationship partner of the parent adopts the child and the parent retains parental rights). We agree that the statutes governing independent adoptions require a relinquishment of parental rights and conclude that a second parent adoption cannot legally be accomplished by a "modified" independent adoption, a practice developed by the Department of Social Services (Social Services). Accordingly, we grant Sharon's request for writ relief (which is joined in by Joshua) from orders of the superior court (1) denying her motion to dismiss Annette's petition, (2) granting Annette visitation with Joshua over her objection, and (3) compelling her to respond to discovery propounded by Annette and imposing sanctions against her and her attorney.
In doing so, we reject contentions by Annette and amici Children of Lesbians and Gays Everywhere, Family Pride et al. (COLAGE) and the National Center for Youth Law and Legal Services for Children that, although Annette's adoption petition does not meet the express statutory requirements, we should liberally construe the independent adoption statutes to permit a second parent adoption if it is in the best interests of the child. Because the statutory language is clear that the parental rights of a parent placing her child for independent adoption terminate upon approval of the adoption, we conclude that a second parent adoption cannot be accomplished pursuant to that procedure.

FACTUAL AND PROCEDURAL BACKGROUND
Sharon and Annette became involved in a lesbian relationship in 1989 and moved to San Diego together in 1990. The relationship *110 was volatile and over the years Sharon and Annette attended couples counseling to help them work through their conflicts.
In 1996, after being artificially inseminated with sperm from an anonymous donor, Sharon gave birth to a son, Zachary. Annette petitioned to adopt Zachary as a co-parent with Sharon, with Sharon retaining parental rights to Zachary; the superior court approved Annette's petition, apparently despite a contrary recommendation by the San Diego County Department of Health and Human Services (the Department).
Several years later, Sharon underwent artificial insemination again, using sperm from the same anonymous donor as involved in Zachary's conception, and in June 1999, gave birth to Joshua. Shortly thereafter, Sharon and Annette retained an attorney to represent both of them in a proceeding for Annette's adoption of Joshua.
Sharon and Annette signed an "Independent Adoption Placement Agreement," which stated that Sharon was placing Joshua with Annette "for the purpose of independent adoption," that she could only revoke her consent to the adoption within 90 days and that, upon the court's approval of the adoption petition, she would "give up all [her] rights of custody, services, and earnings of [Joshua]...." An addendum to the agreement, on a form developed by Social Services, stated in part that, notwithstanding the contrary language of the agreement, Sharon intended to retain all of her rights as a parent to care, custody and control of Joshua and understood that the adoption, when final, would create a legal parent-child relationship between Annette and Joshua and confer on Annette parenting rights and responsibilities coextensive with her own.
Annette filed a petition to adopt Joshua as a co-parent with Sharon. The petition stated in part that "the birth mother ... consents to this adoption and will execute a limited written consent to the child's adoption in the manner required by law, but ... intends to retain all her rights to custody and control of said child." Eight months later, the Department submitted a report recommending that the court grant Annette's petition to adopt Joshua.
As a result of continuing difficulties between Sharon and Annette, the hearing on Annette's adoption petition was repeatedly postponed at Sharon's request and ultimately Sharon asked Annette to move out of their residence. Thereafter, each of the women retained new counsel in connection with the adoption proceedings. With the assistance of a mediator, the parties reached agreement on a temporary visitation schedule by which Annette would have time with each of the boys, but were unable to agree on a permanent visitation plan.
In September 2001, Annette filed a motion to establish a parental relationship with Joshua and to obtain sole physical custody of Joshua and Zachary. A month later, she filed a motion to adopt Joshua, contending that Sharon's consent to the adoption had become irrevocable pursuant to Family Code section 8814.5, that the adoption was in Joshua's best interests and that she was entitled to parental rights by estoppel.
After a family court services counselor recommended that Sharon and Annette share joint legal custody of the children and that Annette have specified visitation with the boys, Sharon filed a motion to withdraw her consent to the adoption. Sharon contended that her consent to the adoption was the result of "fraud, undue influence and duress, there was no legal basis for the requested adoption and the *111 withdrawal of consent was in Joshua's best interests." The Department submitted a supplemental report recommending that, in light of the nature of Annette's relationship with and involvement in Joshua's life, the court approve Annette's petition to adopt Joshua.
In late November, the court ordered visitation, encouraging the parties to reach agreement on a visitation schedule, and appointed counsel to represent Joshua. Shortly thereafter, Sharon obtained a domestic violence restraining order against Annette and filed a motion to dismiss the adoption petition, arguing that the adoption was unauthorized by statute and that Annette lacked standing to seek to adopt Joshua. After the parties reached agreement on a visitation schedule, Joshua's counsel filed a second motion to dismiss the adoption petition based on the failure of Sharon and Annette's original attorney to comply with the statutory requirements for obtaining Sharon's consent to the proposed adoption. At a hearing, the court denied both motions. Although it did not specifically rule on Sharon's motion to withdraw her consent to the adoption, the court noted that Sharon did not withdraw her consent within the time required by law and indicated that the resolution of the adoption petition was likely to be based on what was in Joshua's best interests.

DISCUSSION

1. The Denial of Sharon's Motion to Dismiss the Adoption Petition

A. Law Governing Adoptions
At common law, there was no mechanism for adopting a person and it is now well established that the ability to adopt another exists purely by virtue of statute. (Adoption of McDonald (1954) 43 Cal.2d 447, 452, 274 P.2d 860; see also Fam.Code, § 8600.) The Family Code authorizes three methods for adopting an unmarried minor: (1) an agency adoption (Fam.Code, § 8700 et seq.); (2) an independent adoption (Fam.Code, § 8800 et seq.); and (3) a stepparent adoption (Fam. Code, § 9000).

(1) Agency Adoption
In an agency adoption, the existing parents of the child (referred to by statute and hereinafter as the "birth parents"; see Fam.Code, § 8512) relinquish their parental rights to the child to a licensed adoption agency or Social Services. (Fam. Code, §§ 8700, 8518.) In their relinquishment, the birth parents may name the person or persons with whom such parent or parents intend for the child to be placed. (Fam.Code, § 8700, subd. (f).) A relinquishment of parental rights terminates the birth parents' parental rights and responsibilities (Fam.Code, § 8700, subds. (e), (j)) and gives exclusive custody and control of the child to the agency or Social Services pending adoption of the child. (Fam.Code, §§ 8700, subds. (e), (j), 8704, subd. (a).) Typically, the agency or Social Services conducts a home study and places the child with the prospective adoptive parents for a test period before consenting to the adoption. (Fam.Code, § 8704, subds.(a), (b); see generally, 10 Witkin, Summary of Cal. Law (9th ed. 1989 & 2001 Supp.) § 388.) Upon court approval of an agency adoption, the adoptive parents attain all the rights and duties as parents of the child and birth parents are relieved of all such rights and duties. (Fam.Code, §§ 8616, 8617.) However, if the birth parents designate the adoptive parents and the child is not placed with or is removed from the home of the persons so designated, the birth parents may, within a specified period of time, rescind the relinquishment of their parental rights. (Fam.Code, § 8700, subd. (h).)

*112 (2) Independent Adoption
An independent adoption differs from an agency adoption in that the birth parents agree to relinquish their parental rights to the child directly to the adoptive parents. (Fam.Code, § 8801; see also § 8524.) The selection of the prospective adoptive parents must be made directly by the birth parents, who then must consent to the adoption by signing an adoption placement agreement; their consent becomes irrevocable after 90 days. (Fam.Code, § 8801.3, subds.(b), (c)(2).) Upon court approval of the independent adoption, the adoptive parents attain all the rights and duties as parents of the child and birth parents are relieved of all such rights and duties. (Fam.Code, §§ 8616, 8617.)

(3) Stepparent Adoption
In a stepparent adoption, the spouse of the child's birth parent petitions the court to adopt the child, with the consent of one or both of the birth parents. (Fam.Code, §§ 9000, subd. (a), 9003, subd. (a), 9005, subd. (a).) Unlike the other two types of adoption, the approval of a stepparent adoption does not result in a termination of the birth parent's rights and obligations with respect to the child. (Fam.Code, §§ 8548, 9004.)

B. Annette's Adoption Petition
Annette concedes that her petition to adopt Joshua does not meet the express criteria for any of these statutorily authorized adoptions. Because Annette is not Sharon's spouse (see Fam.Code, § 308.5), she cannot apply to adopt Joshua as a stepparent. (Fam.Code, § 9000, subd. (a).) Sharon did not agree to relinquish her parental rights to an adoption agency or to Social Services, a prerequisite to an agency adoption. (Fam.Code, §§ 8700, subd. (a), 8703.) Finally, because Sharon did not unequivocally consent to a termination of her parental rights, the statutory requirements for an independent adoption have not been met. (Fam.Code, §§ 8617, 8819.)
Annette argued below, and the juvenile court agreed, that her adoption petition was proper as one seeking a "modified" independent adoption. Annette and amici argue that the adoption statutes must be liberally construed to promote justice and protect the welfare of children and that we should not literally apply those statutes to preclude a second parent adoption that is in the best interests of the child. They point out that Social Services has developed procedures and forms to facilitate second parent adoptions and argue anecdotally that local agencies have "routinely" recommended, and the superior courts have approved, second parent adoption petitions for at least ten years.
We requested briefing from Social Services regarding the basis for its procedures, practices and policies regarding second parent adoptions. Without explaining why it adopted those procedures and practices, Social Services responded that its policy regarding second parent adoptions is that "decisions regarding adoption placements and recommendations regarding adoption petitions will be made on a case-by-case basis. Licensed adoption agencies and [Social Services] will no longer deny applications, withhold consent to an adoption petition, or recommend disapproval of an adoption petition based solely on the applicants' or petitioners' marital status. [f]A petition or an application for limited consent or limited relinquishment adoption, in which a birth parent, or adoption parent, simultaneously retains parental rights and consents, agrees, or designates the adoptive parent of his or her child by an unrelated adult, is to be reviewed on its merits pursuant to the California Family Code." In accordance with the policies and *113 procedures, "each case is to be assessed on its own merits, with the child's best interests as the paramount criterion when accepted social work practices and principles are applied."
Social Services indicates that, "[although there does not appear to be express statutory authority for second parent adoptions," it developed practices and procedures to facilitate second parent adoptions through one of two means: (1) a modified independent adoption, in which the birth parent consents to the adoption but expresses an intent to retain her parental rights or (2) an agency adoption, in which the birth parent relinquishes her or his rights to the custody and control of the child to the adoption agency or adoption district office but expressly designates the adoptive parents to be herself or himself and the prospective second parent. As Annette used the former method, the issue presented is whether a second parent adoption can properly be accomplished by independent adoption. We conclude that it cannot.
Annette and amici argue, and the dissent agrees, that, under the guise of a "liberal interpretation" of the statutory scheme, this court may sanction a second parent adoption that is carried out by a modified independent adoption even though it does not "strictly comply" with the statutory requirements. COLAGE and Annette cite to Marshall v. Marshall (1925) 196 Cal. 761, 239 P. 36 {Marshall), a case in which a former husband sought to modify divorce decrees to eliminate his obligation to pay alimony for the support of his ex-wife's children, whom he had adopted while the couple was married. In accordance with a dissolution agreement between the parties, the former husband agreed to pay the wife monthly support for the children and to "surrender the adoption of said children," with the understanding that the wife would readopt them. The trial court granted the husband's request, apparently based on the conclusion that, as a result of the wife's re-adoption of the children, "there were no children of the marriage" and thus the court had no jurisdiction to award alimony for their support. (Id. at p. 764, 239 P. 36.)
The Supreme Court reversed the trial court's order, finding that the trial court had jurisdiction to award alimony regardless of whether there were children of the marriage. (Marshall, supra, 196 Cal. at p. 765, 239 P. 36.) Notwithstanding this determination, the court went on to address an issue not raised by the parties, to wit, the validity of the wife's readoption of the children. (Ibid.) In the analysis on which Annette, COLAGE and the dissent now rely, the court concluded that the wife's readoption of the children was a legal nullity because, notwithstanding the language of then Civil Code section 229 (now Family Code section 8617), which provided that the parents of a child offered for adoption are relieved of all parental duties at the time of the adoption, the wife's parental rights did not terminate when the husband adopted the children during the marriage and thus there was no need for readoption.
Marshall is not controlling on the issue presented. The Marshall analysis relied on by Annette, amici and the dissent was not necessary to the determination of the issue before the court in that case. The language is thus dicta and, although entitled to due consideration, is not binding on us. (People v. Garrett (1998) 67 Cal. App.4th 1419, 1422, 79 Cal.Rptr.2d 803.) Further, in the 75 years since Marshall was decided, that analysis has not been applied by any court in a published opinion as the basis for declining to give effect to Family Code section 8617 (or its predecessors), which is what Annette asks us to do here. We decline to read Marshall as an *114 open invitation to disregard the express language of the statutes governing independent adoptions.
More importantly, the concept of liberal interpretation cannot be used to defeat the overall statutory framework and fundamental rules of statutory construction. The role of the courts is to interpret and apply the existing statutes in accordance with the Legislature's expressed intention, not to re-write the statutes or question the Legislature's wisdom in adopting them. (See generally, California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist. (1997) 14 Cal.4th 627, 633, 59 Cal.Rptr.2d 671, 927 P.2d 1175.) The issue before us is whether the statutes authorize the use of an independent adoption to accomplish a second parent adoption. In accordance with the clear and unambiguous language of the statutes, no such authorization exists.
Annette contends that, even if Marshall is not dispositive (a point that she does not concede), we should recognize the authority of the superior court to approve a second parent adoption based on what she referred to at oral argument as the "authoritative force of nonprecedential decisions" (i.e., Social Services' development of procedures to facilitate second parent adoptions and the approval of such adoptions by the family courts). However, in the face of an unambiguous statutory scheme that belies those decisions, we reject this contention. While agency interpretations of statutes within the purview of the agency's expertise are often given deference, "`administrative construction of a statute, while entitled to weight, cannot prevail when a contrary legislative purpose is apparent. [Citations.]'" (Land v. Anderson (1997) 55 Cal.App.4th 69, 82, 63 Cal.Rptr.2d 717, quoting Pacific Legal Foundation v. Unemployment Ins. Appeals Bd. (1981) 29 Cal.3d 101, 117, 172 Cal.Rptr. 194, 624 P.2d 244.) Thus, no deference should be given to an agency interpretation that is, as here, contrary to the express language of the applicable statutes. Likewise, our interpretation of the statutory scheme is not constrained by the fact that superior courts have approved such adoptions in the past.
Notably, after the Marshall decision, the Legislature amended the Family Code to authorize stepparent adoptions without a termination of parental rights on the part of the birth parent. (Fam.Code, § 8548 [defining a stepparent adoption as "an adoption of a child by a stepparent where one birth parent retains custody and control of the child"]; see § 9004.) Although it could have easily done so, the Legislature has not similarly amended the statutory provisions governing independent adoptions to eliminate' the necessity of a termination of the existing parent's rights to the child and thus to authorize the use of modified independent adoptions by co-parents.
The issue of whether to allow such adoptions involves important social, economic and other policy considerations; such a matter is appropriately deferred to the Legislature, which is best equipped to address this issue and which has historically provided the framework that defines the scope of permissible adoptions. (See generally, Johnson v. Calvert (1993) 5 Cal.4th 84, 97, 19 Cal.Rptr.2d 494, 851 P.2d 776.) In light of such policy considerations involved, we cannot construe past legislative inaction as evidence of the Legislature's approval of the use of modified independent adoption procedure to accomplish second parent adoptions. (See In re Christian S. (1994) 7 Cal.4th 768, 782, 30 Cal. Rptr.2d 33, 872 P.2d 574 ["we reject the view that the Legislature silently enacts major social policy"].)
*115 In fact, in 1997 and 1998, the Legislature considered, but did not adopt, a bill that would have provided that two unmarried adults may adopt a child. (Assem. Bill No. 53 (1997-1998 Reg. Sess.) §§ 1, 2.) Notably, after oral argument was held in this matter, the Legislature passed and the Governor signed into law Assembly Bill No. 25, which will, upon becoming effective in January 2002, allow a member of an unmarried couple that has registered as a domestic partnership as provided in the Family Code to adopt a child of his or her domestic partner. (Stats.2001. ch. 893, § 3, at http://www.leginfo.ca.gov.) The recent enactment of this legislation is a clear indication that the Legislature did not previously authorize the accomplishment of second parent adoptions through the use of a modified independent adoption procedure.
Because the statutes currently governing independent adoptions mandate that the parental rights of the birth parent be terminated, something that Sharon did not unequivocally agree to and that was never intended by either of the parties here, the juvenile court erred in denying Sharon's motion to dismiss the pending adoption petition and in ordering visitation between Annette and Joshua. (See Guardianship of Z.C.W. (1999) 71 Cal.App.4th 524, 527, 84 Cal.Rptr.2d 48, and cases cited therein [lesbian who is not the adoptive or biological parent of a child conceived during her relationship with the birth mother is not entitled to custody of or visitation with the child]; West v. Superior Court (1997) 59 Cal.App.4th 302, 305, 69 Cal.Rptr.2d 160 [nonparent lacks standing to seek custody or visitation of such a child].) Although Annette, amici and the dissent urge that a strict application of the applicable statutes will jeopardize the validity and/or finality of thousands of adoptions that were undertaking using a modified independent adoption procedure, Annette's petition for rehearing cites a number of authorities for the proposition that at least most of those adoptions are no longer subject to viable challenge. As Annette admits, however, the issue of the validity of such adoptions is not presented in this case and has not been briefed by the parties and we do not address it here.

2. Discovery and Sanctions Orders

During the pendency of the briefing on the parties' motions to dismiss, Annette sought discovery as to communications between Sharon and her therapists regarding Sharon's allegations of domestic violence and its impact on her. Annette argued Sharon had waived the psychotherapist-patient privilege by asserting that her consent to the adoption was obtained by fraud or undue influence arising from Annette's acts of domestic violence against her. The court granted various motions by Annette to compel responses to the discovery and imposed sanctions on Sharon and/or her counsel.
Sharon contends that, because Annette's petition for adoption was invalid, the superior court acted in excess of its jurisdiction in issuing the discovery and sanctions orders. The request for writ relief from the orders compelling discovery is moot in light of our conclusion that the petition for adoption must be dismissed. The only remaining issue is the discovery sanctions.
Although we find Sharon's jurisdictional argument unavailing, in light of our determination that the adoption petition must be dismissed, we also conclude that the sanctions orders should also be vacated.

DISPOSITION
The petition for writ of mandamus is granted. The superior court is directed to vacate its orders denying Sharon's motion to dismiss Annette's adoption petition, granting Annette visitation and compelling responses to discovery and payment of sanctions and to enter a new order granting the motion to dismiss the adoption *116 petition. Each party is to bear their own costs.
McDONALD, J., concurs.
KREMER, P.J.
I respectfully dissent.
Since I believe the Supreme Court's decision in Marshall v. Marshall (1925) 196 Cal. 761, 239 P. 36 (Marshall) controls this case, I would deny Sharon's petition for writ of mandamus directing the superior court to vacate its order denying Sharon's motion to dismiss Annette's adoption petition. The majority's attempts to distinguish Marshall or characterize its holding as dictum are unconvincing.
In Marshall, the widowed natural mother (Mother) of two minor children married her second husband (Stepfather) who with Mother's written consent proceeded to adopt the children under former Civil Code section 221 et seq. (Marshall, supra, 196 Cal. at pp. 763, 766-767, 239 P. 36.) During later divorce proceedings between Mother and Stepfather, the parties agreed that Stepfather would pay Mother alimony for support of the two children. (Id. at p. 763, 239 P. 36.) The parties also agreed that Stepfather would surrender his adoption of the children and that Mother would readopt the children. (Ibid.) Upon Mother's ensuing petition for adoption of the children together with Stepfather's written consent to such adoption, the superior court entered a decree purporting to accomplish Mother's adoption of her own children. (Ibid.) A few days later, the superior court rendered an interlocutory decree awarding custody of the children to Mother and ordering Stepfather to pay Mother child support alimony in accord with the parties' earlier agreement. (Id. at pp. 763-764, 239 P. 36.) For about two years, Stepfather paid Mother the child support alimony provided in the parties' earlier agreement and the interlocutory decree. (Id. at p. 764, 239 P. 36.) Meanwhile, the superior court entered a final decree containing the same child support alimony provision. (Ibid.)
Eventually, upon Stepfather's modification motion, the superior court struck the child support alimony provisions of the interlocutory and final decrees on the ground that at the time of those decrees, there were no children of the parties' marriage. (Marshall, supra, 196 Cal. at p. 764, 239 P. 36.) The superior court's order granting such motion was based upon a conclusion that the court lacked jurisdiction to award child support alimony because Mother's adoption of the children had changed their status so that they were no longer the children of the parties to the divorce action. (Ibid.) However, the Supreme Court concluded such order was erroneous to the extent it was made solely on the ground that the child support alimony provisions originally included in the decrees were void as exceeding the superior court's jurisdiction. (Id. at p. 765, 239 P. 36.) In considering the question of the validity and effect of the proceeding where Mother had purported to adopt her own children, the Supreme Court noted that the Civil Code adoption provisions at that time did not contain any definition of the term "adoption." (Ibid.) Characterizing adoption as "a proceeding by which the adopting parent assumes a parental relationship toward the child of another," the Supreme Court observed that it seemed "unthinkable that one who is both the natural mother and the legal mother of a child can legally adopt such child." (Id. at p. 766, 239 P. 36.) Noting that the "natural mother of a child could legally adopt such child only in a case wherein her parental relationship had theretofore been severed as a matter of law," the Supreme Court then considered the question whether Stepfather's adoption of the children had *117 the effect of legally severing Mother's parental relationship with the children. (Ibid.) In doing so, the Supreme Court determined Stepfather's adoption of the children did not have such effect under the circumstances, "notwithstanding the provisions of Civil Code, section 229, that `the parents of an adopted child are, from the time of the adoption, relieved of all parental duties towards, and all responsibility for, the child so adopted, and have no right over it.'" (Ibid.) Noting it was "plain" from the record of the adoption proceedings that the parties did not intend "to sever the parental relationship" between Mother and the children, the Supreme Court stated it also seemed "plain" that after completion of Stepfather's adoption proceeding, "the mother of the children still retained her parental relationship toward them, legally as well as by blood." (Id. at pp. 766-767, 239 P. 36.) The Supreme Court observed: "If this be so, it would follow that the proceeding thereafter, whereby she purported to adopt these children, was an utter nullity. If it was not, it would follow as matter of logic, for example, that a wife could, with her husband's consent, legally adopt their minor child and thus sever, as a matter of law, the parental relationship between such child and its father." (Id. at p. 767, 239 P. 36.)
The Supreme Court in Marshall then proceeded to cite In re Williams (1894) 102 Cal. 70, 36 P. 407 as holding that "although no express authority therefor is to be found in the code, nevertheless a husband and wife may jointly adopt a child pursuant to the procedure therein prescribed, the result of which is to make the child, in law, the child of both spouses." (Marshall, supra, 196 Cal. at p. 767, 239 P. 36.) Observing that "(s]uch was the obvious purpose and intent of both of the parties and of the court in the proceeding whereby the defendant herein [Stepfather] purported to adopt the minor children of the plaintiff [Mother], his wife," the Supreme Court in Marshall stated: "We are not prepared to hold that section 229 of the Civil Code was intended to apply to a situation such as this, and to effect a result so plainly opposite to that which was intended." (Ibid.) Accordingly, the Supreme Court concluded the superior court had jurisdiction to include child support alimony provisions in its interlocutory/final decrees and that the superior court's later order vacating such provisions as void should be reversed. (Ibid.)
California adoption laws are to be construed liberally to protect the welfare of children. (Department of Social Welfare v. Superior Court (1969) 1 Cal.3d 1, 6, 81 Cal.Rptr. 345, 459 P.2d 897.)[1] Consistent with that principle, the Supreme Court has not construed strictly or enforced literally the statutory language requiring termination of a birth parent's rights (former Civ.Code, § 229, now Fam.Code, § 8617).[2] *118 In particular, at a time when the Civil Code adoption statutes did not specifically authorize stepparent adoptions, the Supreme Court in Marshall expressly declined to apply in a stepparent adoption context the literal language of Family Code section 8617's predecessor statute that would have resulted in the full termination of the birth mother's parental rights contrary to the "plainly opposite" intent of the parties that the birth mother retain her parental rights. (Marshall, supra, 196 Cal. at p. 767, 239 P. 36.) In effect, the Supreme Court in Marshall read second-parent adoption into the statute and did not require full relinquishment or termination of the birth parent's parental rights. Further, nothing in Marshall limited its reasoning about second-parent adoption to a stepparent context. (See Nancy S. v. Michele G. (1991) 228 Cal.App.3d 831, 841, fn. 8, 279 Cal.Rptr. 212.)[3] Moreover, although the adoption statutes now acknowledge stepparent adoptions (Fam.Code, §§ 8548, 9000-9007), the Legislature has not codified in those sections or in Family Code section 8617 any explicit stepparent exception to the termination of the birth parent's rights still required under a literal application of Family Code section 8617. Additionally, nothing in Family Code sections 8548 or 9000 through 9007 precludes other forms of adoption that preserve the child's legal relationship with one birth parent.[4] Finally, when the birth mother and the prospective second parent intend to effect a second-parent adoption without severing the birth mother's ties to the child, it would be absurd to construe Family Code section 8617 as requiring termination of the birth mother's rights upon completion of the adoption by that second parent. (Cf. Times Mirror Co. v. Superior Court (1991) 53 Cal.3d 1325, 1334, fn. 7, 283 Cal.Rptr. 893, 813 P.2d 240.)[5] Accordingly, applying Marshall as we must (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937 [Supreme Court decisions "are binding upon and must be followed by all the state courts of California"]), I would conclude that Family Code section 8617 as the successor statute of Civil Code section 229 was not intended to apply here "to *119 effect a result so plainly opposite" to the result originally intended by Sharon and Annette. (Marshall, supra, at p. 767, 239 P. 36.)
In that vein, the language used in the adoption proceedings here is comparable to that in Marshall. Specifically, Stepfather's adoption petition in Marshall recited that he was "`a fit and proper person to be allowed the joint custody and control of said minor children ... with that of the right of their mother to have such custody and control'" and prayed for "`an order that the ... minors [be] adopted and that they be declared to be adopted by [Stepfather], in that he shall jointly together with his wife [the minors' birth mother] be adjudged on such adoption as having the status of the natural father of said minors. ...'" (Marshall, supra, 196 Cal. at p. 766, 239 P. 36.) Further, in Marshall, in consenting in writing to the adoption by Stepfather, Mother stated that Stepfather would adopt the "minors, my children, as his own natural children and that in conjunction and jointly with me act, maintain and have the legal status of a father and ... shall jointly with me maintain the relationship of a parent to said minors herein mentioned.'" (Id. at pp. 766-767, 239 P. 36.) Additionally, in Marshall, the final provision of the trial court's adoption order stated: "`and that all other persons shall be henceforth relieved of any parental duty towards and all responsibility for the said children and have no right or control whatever over them save that of the mother of said minors, namely, [Mother], wife of petitioner [Stepfather] herein.'" (Id. at p. 767, 239 P. 36.)
Similar to the situation in Marshall, the parties here plainly intended originally that Annette's adoption of Joshua would not sever the parental relationship between Sharon and Joshua but instead that Joshua would be the child of both Sharon and Annette. Specifically, as noted by the majority, the addendum to the parties' independent adoption placement agreement provided that, notwithstanding any contrary language in the agreement itself, Sharon intended to retain all her parental rights to care, custody and control of Joshua and understood that the adoption when final would create a legal parent-child relationship between Annette and Joshua and would confer on Annette parenting rights and responsibilities coextensive with Sharon's own.
In sum, under authority of Marshall, supra, 196 Cal. 761, 239 P. 36, I would conclude that the prospective second-parent adoption at issue here is permissible under the Family Code adoption provisions as directly analogous to California's stepparent adoption practice for the past 75 years, both before any express statutory acknowledgment of stepparent adoptions and afterwards. Accordingly, I would not interpret Family Code section 8617 as a barrier to this pending second-parent adoption where the parties clearly never intended to sever birth parent Sharon's parental rights or responsibilities to Joshua.
Finally, this case between Sharon and Annette does not exist in a vacuum. Instead, in addition to imposing upon a procedural statute an overly narrow construction directly contravening the Supreme Court's express interpretation of the statute's predecessor, the majority's apparent sweeping conclusion that courts lack jurisdiction to grant second-parent adoptions under the procedures at issue here calls into question the legitimacy of hundreds or perhaps thousands of existing parent-child relationships created through those procedures. Further, the majority opinion undermines the expectations of finality reasonably held by parties to second-parent adoptions effected under such procedures *120 even though those parties used Judicial Council form orders of adoption and employed forms suggested by the California Department of Social Services (CDSS) in accord with CDSS's view of second-parent adoptions as valid under applicable law.[6] The majority opinion invites attempts to nullify completed second-party adoptions in myriad species of litigation including support/custody/visitation disputes, inheritance contests and withdrawals of entitlements to previously available health and pension benefits, both governmental and private. The ultimate financial and emotional losers will be children who are the intended beneficiaries of California's adoption laws.
For all those reasons, I believe the superior court's order denying Sharon's motion to dismiss Annette's adoption petition should be upheld and the matter remanded for resolution of remaining legal and factual issues including the voluntariness of Sharon's consent to the adoption.
NOTES
[1] The Supreme Court has stated: "The rule is that the adoption statutes are to be liberally construed with a view to effect their objects and to promote justice. Such a construction should be given as will sustain, rather than defeat, the object they have in view. The main purpose of such statutes is the promotion of the welfare of children `by the legal recognition and regulation of the consummation of the closest conceivable counterpart of the relationship of parent and child.'" (Department of Social Welfare v. Superior Court, supra, 1 Cal.3d at p. 6, 81 Cal.Rptr. 345, 459 P.2d 897; accord, Adoption of Barnett (1960) 54 Cal.2d 370, 377-379, 6 Cal.Rptr. 562, 354 P.2d 18; In re Johnson (1893) 98 Cal. 531, 536, 539, 33 P. 460; Tyler v. Children's Home Society (1994) 29 Cal.App.4th 511, 540-541, 35 Cal.Rptr.2d 291; Reeves v. Bailey (1975) 53 Cal.App.3d 1019, 1022-1023, 126 Cal. Rptr. 51.)
[2] Family Code section 8617 provides: "The birth parents of an adopted child are, from the time of the adoption, relieved of all parental duties toward, and all responsibility for, the adopted child, and have no right over the child."
[3] In Nancy S. v. Michele G., supra, 228 Cal. App.3d 831, 279 Cal.Rptr. 212, a case involving "same-sex domestic partners[,]" the appellate court stated: "Although the validity of an adoption in these circumstances is not before us, we note that [former] Civil Code section 221 provides, in part, that `[a]ny unmarried minor child may be adopted by any adult person ...' We see nothing in these provisions that would preclude a child from being jointly adopted by someone of the same sex as the natural parent. (Cf. Marshall [.supra,] 196 Cal. 761, 767, 239 P. 36.)" (Id. at p. 841, 279 Cal.Rptr. 212, fns. 7, 8.)
[4] As effectively conceded by Sharon at oral argument, any assertion that the Family Code adoption statutes expressly or implicitly bar any second-parent adoption outside a stepparent context is belied by the availability of second-parent adoptions effected through agency adoption (Fam.Code, § 8700 et seq., in particular § 8700, subds. (f) & (g)) or independent adoption (Fam.Code, § 8800 et seq.) with full relinquishment of the birth parent's rights. Hence, the ultimate thrust of Sharon's writ petition is essentially reduced to reliance upon a narrow literal reading of a procedural statute whose predecessor statute was given a contrary construction by the Supreme Court in a second-parent adoption context.
[5] The Supreme Court has stated: "[W]hile ambiguity is generally thought to be a condition precedent to interpretation, this is not always the case. `The literal meaning of the words of a statute may be disregarded to avoid absurd results....'" (Times Mirror Co. v. Superior Court, supra, 53 Cal.3d at p. 1334, fn. 7, 283 Cal.Rptr. 893, 813 P.2d 240; see Bowling v. Zimmerman (2001) 85 Cal.App.4th 1400, 1427, 103 Cal.Rptr.2d 174.)
[6] Consistent with the Supreme Court's interpretation of Family Code section 8617's predecessor statute in Marshall, CDSS's forms reflect CDSS's policies, practices and procedures recognizing the existence of the type of second-parent adoption at issue here, to wit, where the consenting birth parent simultaneously retains parental rights and agrees to an unrelated adult's adoption of the child.