Filed 8/25/14  In re A.G. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.G. et al., Persons Coming Under the Juvenile Court Law. | |
| HUMBOLDT COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>S.G.,<br><br>        Defendant and Appellant. | A139954<br><br>(Humboldt County<br>Super. Ct. Nos. JV110115-1,<br>JV110115-2) |

S.G. (Mother), the mother of A. and Max, appeals from a dispositional order placing the children with their father in Mexico.  She contends the court erred when it applied Welfare and Institutions Code section 361.2,[1] which governs placement of children with a previously noncustodial parent, and that the court's placement decision was unsupported by sufficient evidence.  Mother also contends the court abused its discretion when it corrected an erroneous prior finding that the children lived with both parents when they were initially removed.  Finally, she maintains Father had to file a section 388 modification petition in order to be awarded custody at the dispositional hearing.  None of her assertions have merit, so we affirm.

_____

[1]Further statutory references are to the Welfare and Institutions Code.

1

## BACKGROUND

A. was seven years old and Max was five when they were removed from Mother's home in July 2011. Mother, who was on probation for child endangerment at the time, turned up at the police station intoxicated and told officers she had violated her probation conditions by having contact with her children. She said she had been caring for A. and Max since Father was deported and that the children were at home without adult supervision. An officer went to the home and found the children unattended but otherwise fine. They were placed in protective custody in a foster home and Mother was jailed.

The next day, Mother told a social worker that the police told her A. and Max were dead and that she was facing manslaughter charges. She seemed confused, was unable to understand or answer the social worker's questions, and displayed little affect, even when told her children were safe. Mother explained she had been granted full custody of the children a month earlier, but it took her a great deal of effort to remember and provide this information. She did not know when Father had been deported or how long the children had been with her. She said someone was watching her children but she did not know who. She said the children were in " 'grave danger' " and " 'very sick,' " but she could not provide details or explain what she meant.

The juvenile court sustained jurisdictional allegations including that Mother's mental health and substance abuse issues interfered with her ability to care for the children and Father was incarcerated in Arizona pending deportation. The Humboldt County Department of Health and Human Services's (the Department) dispositional report said Mother had been convicted of willful cruelty to a child three times since 2006. There had been five police reports of child neglect and endangerment, at least four of which involved Mother's alcohol abuse and confused or delusional behavior. On each of those latter occasions, Father was the nonoffending parent "who either takes custody of the children or that law enforcement is looking for so that the children can be returned."

Father attended the dispositional hearing held on October 13, 2011. The court ordered the Department to provide reunification services to both parents. Father's case

2

plan called for him to stay sober, complete an alcohol and drug assessment, submit to random drug testing, and obtain suitable housing for the children.

By the time of the six-month review hearing in April, 2012, Father was sharing a home with roommates, working around the house and repairing vehicles in exchange for rent. He anticipated that his painting business would pick up in the summer months and hoped to then rent a home for himself and the children. The Department had no concerns about Father's ability to safely care for the children. He said he did not use drugs or alcohol and his behavior did not suggest otherwise. He nonetheless completed a drug and alcohol assessment, which concluded that he did not qualify for substance abuse services. Father was "engaging and interactive" with the children during visits, and the children appeared to be extremely bonded to him. However, Father was waiting to request custody until he could provide A. and Max with a stable family home.

In the spring of 2012 police received tips that Father and his girlfriend were dealing heroin. There were also reports that Father had been allowing his heroin-addicted girlfriend to care for A. and Max. In June police arrested Father on drug and child endangerment charges after officers found the children "basically unsupervised" during an overnight visit with Father, within reach of useable amounts of heroin, hashish and drug paraphernalia. The criminal charges stemming from this incident were ultimately dismissed, but Father remained incarcerated on an immigration hold. Based on these events, the Department filed a subsequent amended petition under sections 342 and 300, subdivision (g) alleging that Father's incarceration left him unable to protect or care for the children. Those allegations were sustained.

In July, 2012, the Department reported that Mother had made "great progress" in her case plan and had demonstrated the desire and ability to regain custody. Her mental stability appeared to have substantially improved and she was working on all of her case plan elements. Father remained in custody due to his immigration status. On July 19, the court placed the children with Mother.

In October, 2012, the Department reported that Mother had relapsed once but was engaged in sobriety and mental health services. Father had been deported to Mexico,

3

where he lived with his mother (Grandmother) on her hacienda. He was driving a truck for income and working on the hacienda. Father wanted the children to remain with Mother if she could safely care for them. If not, he and Grandmother wanted the children to live with them. Father felt he had made "poor choices" that resulted in his arrest and deportation. But, the social worker noted, Father had "demonstrated his desire to parent his children and/or to support the mother in having the children in her care. Although he will no longer have Family Reunification Services, it is expected that he will maintain contact with his children and monitor their progress in their mother's care." On October 25, 2012, at a combined 12-month review and disposition hearing on the subsequent amended petition, the court terminated Father's reunification services and continued the placement with Mother under a family maintenance plan.

Then Mother's situation took a turn for the worse. In January 2013, the Department filed a supplemental petition under section 387 to remove the children from Mother's custody.[2] The Department alleged that Mother's mental health had deteriorated and that she was abusing prescription medications. She had been videotaped stealing an expensive camera and other items from her workplace. When questioned about the theft she told the social worker that "There is more than one of me." Mother had also left A. with a former caregiver, saying she thought A. was stealing her medications and that Mother could no longer care for her. According to the detention report, Mother "needs almost constant monitoring to ensure that she takes her medication as prescribed, that she refrains from using alcohol and that she maintains her apartment. [Mother's] recent statements to the children about having [A.] adopted or having her go to Juvenile Hall are emotionally abusive to both of her children. The level of monitoring to ensure [Mother's] sobriety and her inability to engage in and benefit from counseling has not changed significantly since the children's removal in 2011. Child Welfare Services has

_____

[2]A supplemental petition under section 387 is employed when a previous disposition has not been effective and the Department seeks a more restrictive level of custody, including placement in the home of a noncustodial parent. (§ 387, subd. (b); Cal. Rules of Court, rule 5.560(c).)

made every effort to gain for the mother mental health evaluations and services, but the mother has not been able to make use of those services to address the mental health issues which put the children at risk of abuse and/or neglect."

The jurisdictional hearing on the supplemental petition was held on March 18, 2013. Mother denied the substance abuse allegation. Instead, she explained, her medications were missing because somebody, "[i]t could be anybody, from my ex-fianc[é] to the landlord's niece or daughter," was stealing them. Or maybe A. stole her pills. She also denied stealing items from her workplace. Mother believed that someone had stolen her identification, jewelry, makeup and clothing from her apartment and was using them to impersonate her. She denied having said she could not take care of her children. She also denied having any mental health issues. She had not passed out drunk since the children were taken from her, although she had been drunk in her own home. She was no longer taking medication, "so it can't be stolen." The court sustained the petition. On April 8, after a contested disposition as to Mother only, the court again removed the children from her custody and placed them in foster care.

The disposition as to Father was continued several times while the Department awaited a home evaluation being conducted by DIF, the Department's counterpart child welfare agency in Mexico.[3] The Department recommended placement with Father in Mexico subject to DIF's supervision for at least six months. It reported that Father had been consistently appropriate, safe and loving during 32 hours of supervised visitation, and the children "thoroughly enjoyed their visits with their father and are very much attached and bonded with him." None of the Department's social workers, social service aids or care providers who had interacted with Father had seen signs of alcohol or substance abuse.

Father told the Department that he and his family in Mexico had formerly been targeted by extortionists, but the extortionists had left them alone since his father died 12 years ago and Grandmother moved far away from their former home. Father felt they

_____

[3]The DIF is the family welfare agency of Mexico, the Sistema Nacional para el Desarrollo Integral de la Familia.

5

were now safe from any criminals. He had sold his own house in the city and used the proceeds to start a propane delivery business and build a three-bedroom house on his mother's ranch. There was a school near his home, but Father felt A. and Max were too advanced for it and had located a private school that gives instruction in both English and Spanish.

The Department's social worker believed Father was no longer involved in illegal activity, could provide for the children, and had "demonstrated his devotion and love for [them] throughout his history with our Department." Father was willing to take the children for monthly assessments by the DIF and allow DIF to visit the children at home at any time. DIF agreed to conduct six monthly assessments to ensure the children's medical, dental and educational needs were being met, direct Father to substance abuse classes, and send the Department quarterly reports. The case plan mandated that the family would remain in contact with the Department and DIF after the children were placed in Mexico.

Mother and the children's counsel opposed the proposed placement. So did the CASA advocate (Court Appointed Special Advocate), who felt there were "many questionable facts" and "considerable reason for doubt" about Father's ability to provide the children a safe and stable life in Mexico. Instead, the CASA advocate recommended adoption by the children's current foster parents.

A contested dispositional hearing was held on June 28 and July 2, 2013. The social worker testified that, while she did not feel the children were safe at Father's home when he was arrested in June 2012, the situation had changed. Father was living with his mother, had a legal source of income, was cooperative about his case plan activities, and was willing to do any services required. There were no impediments to his caring for Max and A. A. wanted to live with Father and was excited when she was told it was a possibility. Both the maternal grandmother and the children's current caretaker said Father had always been a good parent. A former foster parent testified that the children had strong relationships with Father and "were happy with him and that they loved him."

The social worker had resolved her initial concerns that Father and the children might be endangered by cartels or others who had once threatened and extorted the family.

After two days of testimony followed by extensive written arguments, the court found the children's placement was governed by section 361.2 because they were "[i]ndisputably" residing solely with Mother when the events arose that brought them within dependency court jurisdiction. It further found that a dispositional finding in October, 2011, that indicated the children were initially removed from *both* parents was "clearly and without question . . . an error."

The court then considered whether there was clear and convincing evidence that placing the children with Father would be detrimental to their safety, protection, or physical or emotional well-being. "The evidence, to briefly summarize it, is that there is an appropriate home and appropriate school, the ability to provide, and so forth. The concerning evidence is the testimony and evidence regarding the June 2012 incident and the subsequent letter to the social worker. Those two things separately or in combination raise some concern, but it is my finding that they do not constitute proof by clear and convincing evidence that [placement with Father] would be detrimental to the children. Rather, it's only some evidence that it may cause some detriment, certainly not rising in my finding even close to the clear and convincing evidence. Therefore, under Welfare & Institutions Code section 361.2, I will be ordering that the children be placed with [Father]." The court found there was a substantial danger to the children's health, safety, protection or well-being if they were returned to Mother and that there were no reasonable means to protect them short of removal.

The court ordered that the children be placed in Father's home with family maintenance services, subject to the court's continuing jurisdiction. Mother filed this timely appeal.

## DISCUSSION

### I. The Juvenile Court Properly Applied Section 361.2

Under section 361.2, subdivision (a), "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the

7

child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." Mother argues that jurisdictional findings against father, his drug arrest, deportation, and the ensuing termination of his reunification services rendered him ineligible for consideration under section 361.2 as a matter of law. Father disputes her contention that section 361.2 imposes an unwritten requirement that the parent seeking custody be "nonoffending." We agree that it imposes no such requirement.

*In re Nickolas T.* (2013) 217 Cal.App.4th 1492, 1504 (*Nickolas T.*) recently rejected a similar effort to interpret a "nonoffending parent" requirement into the statute. It is dispositive here. Faced with the same statutory interpretation Mother advocates, the *Nickolas T.* court was unpersuaded that it was at liberty to graft new requirements onto the statute. "We begin by examining the words of the statute. If the statutory language is not ambiguous, then we presume the Legislature meant what it said, and the plain meaning of the language governs. [Citation.] By its plain terms, . . . Section 361.2, subdivision (a) concerns a parent '*with whom the child was not residing*' at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child' . . . . Section 361.2, subdivision (a) does not automatically exclude from consideration for placement a noncustodial parent who has a history of incarceration, institutionalization or prior involvement with child dependency proceedings. Instead, it directs the court to place the child with the parent unless placement would be detrimental to the child." (*Id.* at p. 1504.)

The *Nickolas T.* court disagreed with the view expressed in *In re A.A.* (2012) 203 Cal.App.4th 597, 608 and *In re John M.* (2013) 217 Cal.App.4th 410, 420–424, that only a "nonoffending" parent, meaning a parent who has not been the subject of a sustained dependency allegation, can be considered for placement under section 361.2. "The term 'nonoffending' does not appear in the text of section 361.2, subdivision (a). [Citations.]

8

Further, section 361, subdivision (c)(1) states the court may remove the 'offending parent' from the home and allow the 'nonoffending parent' to *retain physical custody* on a showing that he or she can protect the child from future harm. Thus, the term 'nonoffending parent' in section 361 refers to a custodial parent who is not the perpetrator of any child abuse or neglect. It does not refer to a noncustodial parent under section 361.2, subdivision (a)." (*Nickolas T., supra*, 217 Cal.App.4th at pp. 1504–1505.) Moreover, "[i]f a noncustodial parent is in some way responsible for the events or conditions that currently bring the child within section 300—in other words, if the parent is an 'offending' parent—those facts may constitute clear evidence of detriment under section 361.2, subdivision (a). The statute does not require the court, prior to assessing whether placement with a noncustodial parent would be detrimental to the child, to first determine whether that parent is a 'nonoffending noncustodial parent' or 'offending noncustodial parent,' and whether that parent retains 'the right to physical custody' of the child. According to the plain language of the applicable statutes, there is no need to address or litigate those issues." (*Id.* at p. 1505.)

We agree. Had the Legislature intended to restrict placement consideration under section 361.2 to "nonoffending" parents, it easily could have said so in the statute. It did not, and it is not within our purview to rewrite legislation. (See generally *California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 650.) For the reasons stated in *Nickolas T.*, the court correctly assessed the suitability of placing the children with Father under section 361.2, subdivision (a).

Alternatively, Mother contends the court's placement decision is unsupported by substantial evidence. (See *In re Luke M.* (2003) 107 Cal.App.4th 1412, 1426 [substantial evidence review].) She seems to argue that prior findings against Father while he was in custody irrefutably proved detriment, but those findings addressed the parents' circumstances at the time they were made in 2012, not when the court was ruling on custody under section 361.2 almost a year later. They therefore have little bearing on the placement decision at issue here. (See *Nickolas T., supra*, 217 Cal.App.4th at p. 1505 [prior detriment findings are not given preclusive effect at subsequent hearings]; *Blanca*

9

*P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1757 [prior detriment findings lack collateral estoppel effect at subsequent dependency hearings].) We have already described the evidence relevant to the court's placement decision in some detail, and need not repeat it. Suffice it to say that when considered in light of the ample evidence of Father's ability to provide the children with a safe and loving home in Mexico, Mother's reliance on his earlier involvement with drugs, the chance he may once again be targeted by Mexican extortionists, and her suppositions about lax DIF supervision do not compel the conclusion, on clear and convincing evidence, that placement with Father would be detrimental to the children.

In a related argument, Mother contends the court violated her rights when it corrected a factually mistaken prior ruling she contends should have precluded the application of section 361.2. This contention, too, lacks merit. The record confirms, and Mother does not actually dispute, that she had sole physical and legal custody of A. and Max when the case began. Accordingly, Father qualified as a noncustodial parent under section 361.2 when the children were removed. Unfortunately, the October 2011 disposition order was written as if the children had been living with both parents when they were initially removed. No one seemed to notice the mistake until Mother raised it in her closing argument for the section 361.2 disposition hearing nearly two years later. The Department's written rebuttal explained the mistake, and the court agreed that the finding was "clearly and without question . . . an error."

Nonetheless, Mother argues it was an abuse of discretion for the court to disregard the erroneous finding "without prior notice to the parties or affording the parties an opportunity to be heard." The first answer is that, even were this true, she could have suffered no conceivable prejudice because it is irrefutable—and Mother does not even attempt to refute—that the children were in her custody in October 2011. In any event, the Department's rebuttal was delivered to Mother's counsel some three weeks before the disposition hearing and final ruling. Thus, she had ample time to respond to the Department's position if she had a basis to dispute it. She still has not proposed one.

10

## II. There Was No Need For a Section 388 Petition

Finally, Mother contends Father had to file a petition for modification under section 388 to be awarded custody at the dispositional hearing because, as we understand her argument, the court had previously terminated his reunification services. Not so at a dispositional hearing. The children had been removed from Mother, and Father sought custody. As mandated by section 361.2, then, whether the children should be placed with him was necessarily at issue. "If [the noncustodial] parent requests custody, the court *shall* place the child with the parent *unless* it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) Nothing in the dependency laws required Father to file a section 388 petition to raise an issue that was already squarely before the court.

## DISPOSITION

The dispositional order is affirmed. The respondents' motions to dismiss the appeal are denied.

_____
Siggins, J.

We concur:

_____
McGuiness, P.J.

_____
Jenkins, J.

11